Merrimack
No. 2009-788

ATV WATCH & a.

v.

NEW HAMPSHIRE DEPARTMENT OF TRANSPORTATION

Argued: January 13, 2011
Opinion Issued: April 26, 2011

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for the petitioners.

*Michael A. Delaney*, attorney general (*Edith L. Pacillo*, assistant attorney general, on the brief, and *David M. Hilts*, assistant attorney general, orally), for the State.

HICKS, J. The petitioners, ATV Watch and Andrew Walters, appeal orders of the Superior Court (*Mangones*, J.) entered in this action for declaratory and injunctive relief against the New Hampshire Department of Transportation (DOT) seeking disclosure, under the Right-to-Know (RTK) Law, RSA ch. 91-A (2001 & Supp. 2010), and Part I, Article 8 of the State Constitution of records related to allowance of the use of all terrain vehicles (ATVs) on former railroad corridors converted to rail trails by DOT. We affirm.

The following facts are recited in the trial court's orders or are supported in the record. On February 23, 2007, Walters, who is the director of ATV Watch, wrote to the commissioner of DOT regarding a recent inquiry by

ATV Watch to the Federal Highway Administration (FHWA) asking "FHWA to clarify the Federal Statutes related to motorized use of the rails trails that were purchased by the State using Federal Transportation Enhancement (TE) funds." Walters inquired whether the State had any information contrary to the conclusion that federal law prohibited the use of motorized vehicles on such trails, with the exception of, under certain conditions, snowmobiles. David Brillhart, assistant commissioner of DOT, responded that the issues Walters raised "have prompted discussions with the [FHWA] and the NH Department of Resource[s] and Economic Development" (DRED), and that once a "tentative resolution" was reached, he would inform Walters of DOT's "position and our proposed course of action."

In an April 17, 2007 e-mail to Brillhart, Walters requested information in the event "the State intends to 'work around' the restrictions to ATVs." The petitioners do not contend that this e-mail constitutes a RTK request.

Walters e-mailed Brillhart again on July 24, 2007, stating, in part, "Under Article 8 of the New Hampshire State Constitution and under New Hampshire's Right to Know Law (RSA 91-A) I am asking to review all governmental records in the custody or control of [DOT] related to motorized use of New Hampshire's TE funded rail trails." Brillhart responded, by letter dated July 30, 2007, that DOT had "started assembling the information pertaining to [Walter's] request" and that "[g]iven available resources and the scope of [the] request," he expected to have the records available by September 17, 2007.

Walters contacted DOT again on July 31 and August 6, 2007, seeking disclosure of the requested material and contending that DOT's delay in disclosing documents violated the RTK law. On August 22, Brillhart wrote Walters that a portion of the materials he requested had been assembled and was available to him by appointment with DOT personnel. Brillhart specified that the information was gathered from his project files and the files of DOT employees Ram Maddali and Bill Cass. He also specified that DOT was not releasing "preliminary draft correspondence . . . prepared during the months of March, April, May, June and July 2007," or "confidential attorney/client e-mail communications between attorneys within the Department of Justice and [DOT] . . . span[ning] from March 1, 2007 through August 17, 2007." In addition, the letter identified seven documents from which DOT was redacting certain portions that "contain privileged communications or personal notes."

Walters e-mailed Brillhart on August 31, requesting that DOT reconsider its refusal to disclose certain governmental records. Brillhart responded by letter dated September 13, 2007, stating that the requested information had been assembled and was available to Walters by appointment. He also

identified two additional items of correspondence from which DOT was redacting exempt information. Finally, Brillhart declined to reconsider DOT's decision to withhold certain documents.

On November 2, Walters again e-mailed Brillhart asking for an update on his RTK requests and was informed in a November 5 letter from Brillhart that DOT had no new correspondence, other than Walter's, or additional information to release. Walters e-mailed Brillhart on November 21, criticizing DOT's November 5 letter as being "unresponsive to a number of issues we raised." In particular, Walters requested that DOT identify the documents that were being withheld under the various categories of privilege or exemption claimed by DOT, and that DOT give specific reasons for withholding nineteen documents identified by Walters and any additional items that DOT was not releasing. In response, Brillhart declined to offer further details, stating that DOT had "complied with New Hampshire law in responding to your requests."

The petitioners filed their petition for declaratory judgment, injunctive relief, fees, costs and sanctions on January 24, 2008. At a hearing on February 11, 2008, DOT indicated that it had given the petitioners all of the records requested, except for some materials recently located and other materials redacted or withheld on the basis of privilege or exemption. Following the hearing, DOT provided the court under seal with unredacted copies of the withheld documents, along with an index of those materials, for *in camera* review. The court ordered that the index be provided to the petitioners, noting that it would "utilize the [DOT] index as a public *Vaughn* index for purposes of apprising the [petitioners] of the redacted or withheld materials and the positions asserted by [DOT] as to those items." *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973); *Union Leader Corp. v. N.H. Housing Fin. Auth.*, 142 N.H. 540, 548-49 (1997) (discussing use of *Vaughn* index).

Subsequently, the court found that it had difficulty matching some of the withheld items to the descriptions in DOT's index. Therefore, on June 24, 2008, the court ordered DOT to prepare for the court and provide to the petitioners a new *Vaughn* index that "identifies the *withheld* documents by a reasonable description and by reference to their numbering stamp numbers or equivalent numbering" and "set[s] forth the nature of the privilege or grounds for confidentiality that is asserted concerning each withheld document."

On August 21, following its *in camera* review, the court issued its order on the merits. The court individually addressed 28 items, which it labeled as items A through BB, and determined that all were appropriately withheld or redacted, with the exception of an e-mail string on one item and with the caveat that two items were properly withheld as drafts "if not sent

to addressee." The grounds for nondisclosure consisted of privilege as to "[a]ttorney material" or "[a]ttorney-client material," or exemption as to notes or drafts under RSA 91-A:5, VIII and IX (Supp. 2010).

The petitioners unsuccessfully moved to extend the proceedings to conduct discovery, and then asked the court to issue a final order and to award attorney's fees and costs pursuant to RSA 91-A:8 (Supp. 2010). In an order dated September 18, 2009, the court declined to reconsider its rulings on privilege and denied the request for fees, noting that "to a large degree, [the] petitioners appear to be seeking a remedy of an assessment of counsel fees for a period of time during which [they] did not have legal counsel and during which they had not incurred expenses for legal counsel." The petitioners appeal.

■ "Resolution of this case requires us to interpret the Right-to-Know Law, . . . which is a question of law that we review *de novo.*" *Prof'l Firefighters of N.H. v. Local Gov't Ctr.*, 159 N.H. 699, 703 (2010).

> When interpreting a statute, we first look to the plain meaning of the words used and will consider legislative history only if the statutory language is ambiguous. We resolve questions regarding the Right-to Know law with a view to providing the utmost information in order to best effectuate the statutory and constitutional objective of facilitating access to all public documents.

*Id.* (quotation omitted).

On appeal, the petitioners first seek a ruling that "DOT unlawfully limited the scope of its search" for material sought in the petitioners' RTK request. They contend that "[i]t appears the [trial] court did not address this issue." Nevertheless, as the issue was cited in the petition as a specific RTK violation, and discussed at the February 11, 2008 hearing, we interpret the court's failure to find a violation as a rejection of the petitioners' position, and review it as such.

RSA 91-A:4 provides, in part:

> Each public body or agency shall, upon request for any governmental record reasonably described, make available for inspection and copying any such governmental record within its files when such records are immediately available for such release. If a public body or agency is unable to make a governmental record available for immediate inspection and copying, it shall, within 5 business days of request, make such record available, deny the request in writing with reasons, or furnish written acknowledg-

ment of the receipt of the request and a statement of the time reasonably necessary to determine whether the request shall be granted or denied.

RSA 91-A:4, IV (Supp. 2010). We have not yet had occasion to specifically address the adequacy of a public body's or agency's search in response to a RTK request. *Cf. N.H. Civil Liberties Union v. City of Manchester*, 149 N.H. 437, 440 (2003) (noting that while an agency does not have "to create a new document in response to a [RTK] request," it may be required to "assemble existing documents in their original form"); RSA 91-A:4, VII (Supp. 2010). We therefore consult the decisions of other jurisdictions with similar right to know laws "because they are *in pari material* [and] are interpretively helpful, especially in understanding the necessary accommodation of the competing interests involved." *Union Leader Corp.*, 142 N.H. at 546 (quotation omitted).

■ Under the federal Freedom of Information Act (FOIA), "the adequacy of an agency's search for documents . . . is judged by a standard of reasonableness. The crucial issue is not whether relevant documents might exist, but whether the agency's search was reasonably calculated to discover the requested documents." *Church of Scientology Intern. v. United States Dept. of Justice*, 30 F.3d 224, 230 (1st Cir. 1994) (quotations and citation omitted).

> The search need not be exhaustive. Rather, the agency must show beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents. This burden can be met by producing affidavits that are relatively detailed, nonconclusory, and submitted in good faith. Once the agency meets its burden to show that its search was reasonable, the burden shifts to the requester to rebut the agency's evidence by showing that the search was not reasonable or was not conducted in good faith.

*Lee v. United States Atty. for S. Dist. of Fla.*, 289 Fed. Appx. 377, 380 (11th Cir. 2008) (quotations, citations and ellipsis omitted).

Here, the matter of the search's adequacy was addressed at the February 11 hearing, where counsel for the State made the following representation:

> I'm not sure if Mr. Walters is saying that there were some documents that he should have gotten that he didn't get. Without a specific allegation of some document that exists, I — I can't — all I can do is represent to the Court that the DOT went through

its files and was very thorough. As far as I know, there's no other document out there that was not gathered in its search.

Counsel later stated:

The DOT properly gave the scope of its search to its employees. The DOT knows what documents it has and who it should refer that to. . . .

. . . I mean, the DOT knows who's involved in this issue, how long the issue's been going on, and they — they did a reasonable search of their records.

While counsel's representations are conclusory and not particularly detailed, the State had witnesses at the hearing who were presumably prepared to testify. *See* SUPER. CT. ADMIN. ORDER 15 ("An offer of proof as to the testimony of a witness shall be received only if that witness is in the courtroom at the time of the offer."). At a later hearing on the petitioners' motion for discovery, the State's attorney argued: "The Petitioner[s] . . . filed the petition. We had a hearing. That was the time to get the sworn statement that they're after. . . . I had witnesses here. I made offers of proof to this Court." The petitioners did not object to the procedure or seek to examine the State's witnesses at the February 11 hearing. *See Smith v. Shepard*, 144 N.H. 262, 265 (1999) (party failed to object to conducting hearing on offers of proof).

We consider the petitioners to be in a similar position to the FOIA plaintiff in *Iturralde v. Comptroller of Currency*, 315 F.3d 311 (D.C. Cir. 2003), who failed to challenge in the district court the sufficiency of an affidavit that "stated conclusorily that the [State] Department had informed [the plaintiff] by letter that a search of the files of the Bureau of International Narcotics and Law Enforcement Affairs had been conducted, referencing several letters to [the plaintiff]." *Iturralde*, 315 F.3d at 314. The *Iturralde* court noted that "at no point does the affidavit state under oath that a search of the files of the Bureau of International Narcotics and Law Enforcement Affairs was conducted or describe the nature of that search." *Id.* Nevertheless, in part because the plaintiff failed to challenge the affidavit's sufficiency below, the appellate court "treat[ed] the affidavit as sufficient" and determined that "the only question on appeal is whether [the plaintiff] has provided sufficient evidence to raise substantial doubt concerning the adequacy of the Department's search." *Id.* (quotation omitted). We proceed similarly here.

In support of their challenge to the scope of DOT's search, the petitioners cite an e-mail circulated at DOT August 15, 2007, that stated in part:

We have received a Right-to-Know request from ATV Watch in reference to ATV usage of corridors purchased with federal funds. We need to retrieve and isolate relevant related e-mail. "Relevant" in this case means anything that was considered in the discussion process in responding to the [FHWA] letter of February 13, 2007. As such we are interested in e-mail correspondence after February 13, 2007 (date of FHWA letter requesting clarification on the use of ATVs).

■ The petitioners argue that this e-mail was narrower than their RTK request in two ways: (1) "it limited the scope of the agency's internal search to 'e-mail correspondence,' whereas ATV-Watch['s July 24, 2007 RTK request] sought 'all governmental records' "; and (2) it "limited the agency's search to documents 'after February 13, 2007,' " whereas the petitioners "first raised the issue with FHWA of ATVs regarding TE-funded rail-trails in early January, 2007, . . . knew FHWA had been in contact with DOT immediately thereafter" and "sought the documents generated in the January exchange." The State responds that the petitioners' claims are not supported by the record. We agree.

The record indicates that DOT's search was not limited to e-mails. Brillhart's August 22, 2007 letter informing Walters that some of the requested information was then available stated that the information had been gathered from his project files, and Maddali's and Cass's files. The letter also listed among the items being withheld by DOT certain memos, handwritten notes and handwritten memos. In addition, as the State points out, an e-mail circulated at DOT on June 8, 2007, requested the recipients to save, as of April 17, 2007, "all emails, notes, meeting minutes and any other information pertaining to" the "discussion on allowing ATVs on TE funded trails." Thus, the petitioners' argument that DOT limited its search to e-mails is belied by the record. Rather, we read the August 15 e-mail as evidencing DOT's continued search for responsive e-mails after other responsive documents had been made available: In his August 22 letter informing Walters that some responsive materials were then available, Brillhart specifically stated that DOT was "currently working on determining whether any additional emails pertaining to this request exist in electronic form and we will contact you as soon as the computer records become available, but no later than September 17, 2007 as noted in my original correspondence."

The August 15 e-mail also fails, in light of the record, to support an inference that DOT's search was limited to "documents 'after February 13, 2007.' " As noted above, the request contained in the August 15 e-mail did not comprise the entire search conducted by DOT. Brillhart's indication

that his, Maddali's and Cass's files had been searched contained no time frame. Indeed, the record contains documents dated prior to February 13, 2007, including a memo to Cass dated January 8, 2007, and e-mail correspondence between Maddali and Cass spanning the period from January 17 to February 9, 2007. Both of those documents were released to the petitioners on August 22, 2007. We conclude that the petitioners have failed to "provide[] sufficient evidence to raise substantial doubt concerning the adequacy of [DOT's] search." *Iturralde*, 315 F.3d at 314 (quotation omitted).

■ The petitioners next contend that DOT violated the RTK law by withholding documents that were immediately available. They cite *ATV Watch v. N.H. Dep't of Resources & Econ. Dev.*, 155 N.H. 434, 440-41 (2007), in which we stated:

> The time period for responding to a Right-to-Know request is absolute. The statute mandates that an agency make public records available when they are immediately available for release, or otherwise, it must *within five business days of the Right-to-Know request*: (1) make the records available; (2) deny the request in writing with reasons; or (3) acknowledge receipt of the request in writing with a statement of the time reasonably necessary to determine whether the request will be granted or denied. The plain language of the provision does not allow for consideration of the factors applied by the trial court, such as "reasonable speed," "oversight," "fault," "harm," or "prejudice."

The trial court did not specifically rule on the timeliness of disclosure, as it found the issue relevant to an award of attorney's fees and concluded that even assuming DOT's response was untimely, the petitioners were not entitled to attorney's fees. We will, nevertheless, address the legal issue of timeliness.

■ DOT responded to the petitioners' July 24, 2007 request on July 30, which was within five business days. The response acknowledged receipt of the request and stated that "[g]iven available resources and the scope of your request, we anticipate having the 'public records' available to you, as you have requested by September 17, 2007." On its face, the response complies with the RTK law.

The petitioners nevertheless argue that "[w]hen ATV-Watch received the documents on September 13, it appeared that many were probably immediately available in July, and the delay was unnecessary." They do not identify those documents, however, or elaborate as to why they were

"probably" available for immediate release. We therefore reject their argument as inadequately supported.

The petitioners next argue that DOT failed to give sufficient reasons for the exemptions it claimed. Specifically, they contend that Brillhart's August 22, 2007 letter to Walters contained "a list of records and a list of reasons, but made no effort to specify which document went with which reason." The petitioners appear to essentially contend that DOT was required to provide them with some form of *Vaughn* index at the initial stage of responding to a RTK request. Looking again to FOIA cases for guidance, we conclude that the RTK law does not require such a response.

■ "The only statutory requirement applicable to an administrative agency under FOIA is that it inform the requester of its decision to withhold, along with the underlying reasons." *Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 11 (D.D.C. 1995), *aff'd*, 76 F.3d 1232 (D.C. Cir. 1996). The RTK law similarly provides that when an agency denies a RTK request, it "deny the request in writing with reasons." RSA 91-A:4, IV. Courts interpreting FOIA have held that "there is no requirement that an agency provide a . . . Vaughn' index on an initial request for documents." *Schwarz v. United States Dept. of Treasury*, 131 F. Supp. 2d 142, 147 (D.D.C. 2000), *aff'd*, 2001 WL 674636 (D.C. Cir. 2001); *see Sakamoto v. United States E.P.A.*, 443 F. Supp. 2d 1182, 1189 (N.D. Cal. 2006). Rather, "[a]gencies need not provide a Vaughn Index until ordered by a court after the plaintiff has exhausted the administrative process." *Judicial Watch*, 880 F. Supp. at 11. We similarly conclude that an initial agency denial of a RTK request need not contain the detail of a *Vaughn* index, and accordingly reject the petitioners' challenge to DOT's RTK response.

■ The petitioners next argue that DOT's withholding of certain documents as "drafts" was improper because the documents were too far along in development, were circulated to or created by an entity outside DOT, or contain facts. The State counters that the petitioners' arguments were not raised in the trial court and are therefore not preserved for appeal. We note that the petitioners raised the circulation argument in a pleading, and the meaning of the statutory exemption for preliminary drafts was addressed at the February 11 hearing. Therefore, we assume without deciding that the petitioners' arguments are preserved.

The RTK law exempts from disclosure "[p]reliminary drafts, notes, and memoranda and other documents not in their final form and not disclosed, circulated, or available to a quorum or a majority of the members of a public body." RSA 91-A:5, IX. The petitioners argue that the words "[p]reliminary drafts" "together suggest a document only in its budding stage of devel-

opment. Once a document has moved beyond its 'preliminary draft' stage, and has become either a 'preliminary' document or a 'draft,' it is no longer exempt." We disagree.

■ We concur with other jurisdictions holding that the "preliminary draft" exemption in their right to know or freedom of information acts was designed to "protect[] pre-decisional, deliberative communications that are part of an agency's decision-making process." *Harwood v. McDonough*, 799 N.E.2d 859, 863, 864 (Ill. App. Ct. 2003) (quotations omitted) (court looking to FOIA case law to interpret state freedom of information act). The petitioners themselves cite *Wilson v. Freedom of Information Commission*, 435 A.2d 353, 359 (Conn. 1980), in which the Connecticut Supreme Court interpreted the preliminary notes or drafts exemption in that state's freedom of information act as being intended to encompass "records of [the agency's] preliminary, deliberative and predecisional process." They argue, however, that "[t]o the extent the Connecticut construction is useful, it should be recalled that Connecticut's constitution does not contain a corollary to our open government mandate, and that the phrase in New Hampshire must be construed even more narrowly."

■ We find no conflict between Part I, Article 8 of our constitution and a construction of RSA chapter 91-A that exempts predecisional agency documents. Part I, Article 8 provides that "the public's right of access to governmental proceedings and records shall not be *unreasonably* restricted." N.H. CONST. pt. I, art. 8 (emphasis added). As the Connecticut Supreme Court noted, "The object of . . . [preliminary draft] exemptions . . . is to strike [a] balance between the public's right to know and the government's need to function effectively." *Wilson*, 435 A.2d at 359 n.8. In the instant case, the trial court ruled that it was "not persuaded that restrictions on access to preliminary drafts and related notes unreasonably restrict access to" governmental records. We find no error.

■ Having concluded that RSA 91-A:5, IX is intended to protect predecisional agency communications, we reject the petitioners' contrary construction of "preliminary" as denoting an early stage in the drafting process. We agree with the *Wilson* court that "[t]he distinction between . . . [preliminary and final] documents does not consist of the extent to which the person or persons from whom they originate expect to alter them." *Wilson*, 435 A.2d at 358. Accordingly, we reject the petitioners' argument that documents E and Y, which are drafts of a letter from DOT to FHWA, and documents H and I, which are drafts of a letter from DOT to DRED, are too close to completion to be exempt as preliminary drafts.

We also reject the petitioners' argument that documents E and Y are not exempt because they "contain[] facts regarding New Hampshire's definition of 'snow traveling vehicles.'" They cite *Citizens for a Better Environment v. California Department*, 217 Cal. Rptr. 504 (Ct. App. 1985), for the proposition that "[w]hen a document contains facts, rather than contemporaneous opinions or suggestions not based on fact, it is public, regardless of its stage in policy development." We reject that proposition as inconsistent with our premise that the focus of the exemption is on the predecisional posture of the document. We note a similar trend in FOIA law: While "[e]arly FOIA decisions distinguished deliberative from purely factual information," "[t]he deliberative-factual distinction has given way to more process-oriented considerations, i.e., the nature of the process is more significant than the nature of the materials." *Judicial Watch*, 880 F. Supp. at 12.

The petitioners argue that documents D and E, which are letters from DOT to FHWA, as well as documents H and I are not exempt under 91-A:5, IX because they were circulated outside of DOT. Nothing in the plain language of RSA 91-A:5, IX specifically invalidates the exemption when a document is circulated outside the agency. Rather, the statute exempts "documents not in their final form and not disclosed, circulated, or available to a quorum or a majority of the members of a public body." RSA 91-A:5, IX. Two interpretations of the statute are possible: either the terms "disclosed" and "circulated" are modified by "to a quorum or a majority of the members of a public body," *id.*, or they are not. *See State v. Kousounadis*, 159 N.H. 413, 423-24 (2009). Even assuming the latter, the question remains: disclosed or circulated to whom? The petitioners assume that disclosure or circulation outside the agency was intended. The language of RSA 91-A:5, IX alone, however, makes that construction no more plausible than disclosure or circulation to the public, or disclosure or circulation, even within the agency, beyond the person drafting the document.

The last part of RSA 91-A:5, IX, however, indicates that the exemption was intended to distinguish between predecisional documents, on the one hand, and those that are available for policy-making consideration or have been already acted upon, on the other. *See Wilson*, 435 A.2d at 360 (noting that federal courts construing FOIA employ a temporal analysis, "distinguish[ing] between predecisional, decisional, and postdecisional documents relating to agency, law, policy, or procedure"). Describing documents as "available to a quorum or a majority of the members of a public body" delineates a point at which documents become subject to agency deliberation and action. Taking that as the point at which

the legislature intended to make agency documents subject to disclosure, we read the terms "disclosed" and "circulated" as also being modified by "to a quorum or a majority of the members of a public body." RSA 91-A:5, IX.

Legislative history confirms our reading of the statute. The amendment to add this section to RSA chapter 91-A initially exempted "[p]reliminary drafts, notes, and memoranda and other documents not in their final form." N.H.S. JOUR. 854 (2004). When questioned about its intent, Senator Robert Clegg stated, "If I have something that I am working on, and I don't feel is ready to be released to the public or to the Senate as a whole, I don't think that anyone has the right to file a piece of paper that forces me to hand it to them." *Id.* at 857. On the other hand, he stated, "If I take something that is a draft and hand it out to the committee, then it becomes a public document as soon as I make it public." *Id.* The amendment was later revised to add the language "and not disclosed, circulated, or available to a quorum or a majority of those entities defined in RSA 91-A:1-a." *Id.* at 1205. Senator Clegg explained that "[t]he Senate took the House's amendment, which basically clarified that any time a working document was given to a quorum of the public body, it would then have to be public." *Id.* at 1206. Accordingly, we reject the petitioners' assumption that disclosure to another agency invalidates the exemption under RSA 91-A:5, IX.

The petitioners next challenge DOT's withholding of documents under RSA 91-A:5, VIII, which exempts "[a]ny notes or other materials made for personal use that do not have an official purpose, including but not limited to, notes and materials made prior to, during, or after a governmental proceeding." Two documents, labeled A and B by the trial court, were withheld by DOT under RSA 91-A:5, VIII. DOT's second, court-ordered *Vaughn* index described document A as a "February 15, 2007 letter from DRED to Ram Maddali" and cited the reason for withholding or redacting as "[h]andwritten personal notes in margins redacted pursuant to RSA 91-A:5, VIII." B was described as an "[u]ndated draft letter to Commissioner Murray from FWHA" and the reason given was "[h]andwritten personal notes in margins and on sticky note redacted pursuant to RSA 91-A:5, VIII." The trial court found that the materials were properly withheld under RSA 91-A:5, VIII and IX.

The petitioners argue that under RSA 91-A:5, VIII, "all 'notes and materials' made on government time are disclosable unless they have no bearing on the agency's business." We disagree. As the State points out, RSA 91-A:5, VIII clearly contemplates that notes made "on government time" may be exempt, as it applies to notes made "during . . . a

governmental proceeding." RSA 91-A:5, VIII. In addition, we conclude that having "an official purpose" under the statute is narrower than "bearing on the agency's business." Otherwise, "every yellow-sticky note penned by a government official to help him or her remember a work-related task would be a public record." *O'Shea v. West Milford Bd. of Educ*, 918 A.2d 735, 738 (N.J. Super. Ct. App. Div. 2007). Like the *O'Shea* court, we believe "[s]uch absurd results were not contemplated or required by" the Right to Know law. *Id.*

We also reject the petitioners' argument that the redacted material is not exempt because the documents were "circulated to DRED (document A) or FHWA (document B)." The argument is based upon the premise that "[w]hen a 'note' is circulated within or without the agency it is by definition agency business." We find nothing in the language of RSA 91-A:5, VIII to support that premise and therefore reject the petitioners' argument. The petitioners have not shown any error in the trial court's ruling on this issue.

The petitioners next challenge the withholding or redacting of documents on the basis of the attorney-client or work product privileges. The first challenged document, labeled AA by the trial court, is an e-mail from Maddali to DRED that contains the statement: "I have sent copies of these documents to Attorney Mark Hodgdon, [redacted material]." By obtaining an unredacted copy from DRED, the petitioners discovered that the redacted language stated "with a request to coordinate with your attorney."

The petitioners contend "[t]he fact that one agency asked its lawyer to talk to the other agency's lawyer is not a privileged communication. Even if it were, the privilege was waived by its communication with those outside the privileged relationship." We disagree. The redacted language revealed the substance of a communication from DOT to its attorney that was " 'made for the purpose of facilitating the rendition of professional legal services to the client,' " DOT. *State v. Gordon*, 141 N.H. 703, 706 (1997) (quoting N.H.R. Ev. 502(b)). The documents referenced in the communication reveal the issues the attorney would be focusing upon in providing services to his or her client. Moreover, under the circumstances, in which two State agencies, both represented by the attorney general's office, were jointly working on a single policy issue, we cannot say the privileged communication was shared with someone outside the privileged relationship. Accordingly, we find no error.

The petitioners next challenge the redaction from documents X and Z of several e-mail communications between Maddali and lawyers at the attorney general's office. They assert that "[p]art of what was blacked out are the email headers — that is, the 'to,' 'from,' and 'about' lines," and argue that "[n]ot only is there no conceivable basis for a claim of privilege with regard

to the header information, [it] is also an example of information not timely disclosed and only forced into the open as a result of ATV-Watch's litigation."

The trial court found the communications properly redacted and we find no error. DOT's redaction of the e-mails in their entirety is equivalent to withholding a letter sent through the post office to its attorney as an entire document, which is common practice, rather than disclosing the letter with everything but the letterhead and addressee's name and address redacted. As the petitioners acknowledge, DOT identified the senders and recipients of the e-mails in its *Vaughn* index, thus providing the functional equivalent of the information the petitioners claim was denied them.

The petitioners also challenge the labeling as attorney-client privileged of three documents inadvertently withheld from them but provided at or shortly after the February 11 hearing. Specifically, in a February 13, 2008 letter to Walters, Assistant Attorney General Edith Pacillo stated that the documents "contain privileged attorney-client communications or work product concerning the DOT's search for documents in response to your 91-A request. They are being released solely for the limited purpose of responding to allegations in your Petition concerning the scope of the DOT's search for documents . . . ." Notwithstanding the labeling of these documents as attorney-client privileged, they were not withheld on those grounds. Accordingly, we decline to consider this argument further.

The petitioners place in the same category a so-called document "D" (not the trial court's designation) that it claims was never provided to them but was obtained from FHWA via a FOIA request. The document is a letter from DOT to FHWA dated May 10, 2007. Documents E and Y, which DOT withheld, appear to be a similar letter in draft form. The petitioners argue that they "can discern nothing in the document that appears to be privileged," and seek a ruling from us that it is not. The State counters that this issue was not timely raised below, and that the trial court so ruled.

The petitioners first raised the issue at the December 23, 2008 hearing on their motion to extend the proceedings to engage in discovery. They sought to propound interrogatories seeking, as stated in their motion, "critical information regarding the integrity of [DOT's] court ordered Index." The motion noted that the petitioners obtained a document similar to withheld Document Y through a FOIA request to FHWA. The petitioners' attorney explained at the hearing that "what the Vaughn index did not show was . . . whether these documents were circulated outside of the privilege. We're simply asking if they were, then the privilege may have been waived. So it's simply to discover that fact." The State's attorney noted that the petitioners

already had evidence that document D had circulated, and questioned why that evidence had not been brought up earlier. The trial court ruled that petitioners did not raise the issue in a timely fashion.

On appeal, the petitioners assert that while "DOT impugns [them] for not raising issues regarding document 'D' in [their] initial Petition or at the February 2008 hearing," they did not receive the document from FHWA until "March 11, 2008, after the February hearing." Nevertheless, DOT filed its court-ordered *Vaughn* index on July 23, 2008, and the trial court issued its order on the merits on August 22, 2008. The petitioners' make no effort to explain why they did not bring Document D to the trial court's attention before the court ruled on the merits.

In its request for findings and rulings filed after the December 23, 2008 hearing, the petitioners sought to obtain a finding that the draft exemption as to document D was waived by its circulation to FHWA. If we treat that request as a motion to reconsider the court's order on the merits, we review its denial for an unsustainable exercise of discretion. *See Fortin v. Manchester Housing Auth.*, 133 N.H. 154, 160 (1990); *State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion). We cannot say that the court unsustainably exercised its discretion in ruling that the issue was not timely raised.

The petitioners do not separately address any other documents withheld or redacted as attorney-client privileged, but ask us to review all of them and determine that they are not privileged. *Cf. Center for Biological Diversity v. United States Dep't of Agriculture*, 626 F.3d 1113, 1116 (9th Cir. 2010) (district court's determination that a particular FOIA exemption applies is a legal ruling subject to *de novo* review on appeal). The trial court found all of the materials properly withheld or redacted with the exception of an e-mail string in document C. Upon review, we find no error.

The petitioners next contend that DOT's *Vaughn* index was insufficient to determine whether claimed exemptions or privileges applied. The State argues that the petitioners have not preserved this issue for our review. The petitioners respond that they raised the issue in their April 8, 2008 objection to DOT's index of withheld and redacted documents. That pleading, however, relates to the index of withheld and redacted documents filed by DOT on March 26, 2008. On June 24, 2008, the court ordered DOT to prepare a new *Vaughn* index, which DOT filed in July 2008. The petitioners fail to identify where they preserved a timely objection to this document, which was the operative *Vaughn* index for the court's order on the merits. To the extent the petitioners raised an objection at the December 23, 2008 hearing, we note that was after the court's order on the merits. In addition, to the extent the trial court declined to consider the

issue at that time, the petitioners have failed to show an unsustainable exercise of discretion. *See Fortin*, 133 N.H. at 160.

▇ The petitioners next argue that they should have been allowed to conduct discovery. "The decision to disallow . . . discovery is within the sound discretion of the trial judge, and we will uphold it unless it is an unsustainable exercise of discretion." *In the Matter of Maynard & Maynard*, 155 N.H. 630, 636 (2007). In its June 24, 2008 order, the court ordered that after it completed its review of the withheld materials *in camera*, the petitioners would "have leave to file a motion to extend the proceedings in order to engage in discovery. In that pleading [the petitioners] shall articulate their reasons to believe that sanctionable conduct may have been engaged in by defendant or its agents." On September 17, 2008, the petitioners moved to extend the proceedings to conduct discovery. They argued that their "[i]nterrogatories and [r]equests for [p]roduction of [d]ocuments are intended to discover facts and identify witnesses, under oath, regarding sanctionable conduct of [DOT] and its agents." The trial court denied the motion, noting that the petitioners failed to "articulate[] sufficient reasons they have for believing that [DOT] had engaged in sanctionable behavior," but rather "appear[ed] to be seeking discovery in order to then articulate such reasons." The petitioners have failed to show this was an unsustainable exercise of discretion.

▇ Finally, the petitioners argue that the trial court should have awarded them costs and attorney's fees. An award of attorney's fees under the RTK law "requires two findings by the superior court: (1) that the plaintiff's lawsuit was necessary to make the information available; and (2) that the defendant knew or should have known that its conduct violated the statute." *N.H. Challenge v. Commissioner, N.H. Dep't of Educ*, 142 N.H. 246, 249 (1997); *see* RSA 91-A:8, I (Supp. 2010). The trial court found that the "[p]etitioner[s] in this case did not obtain any documents as a result of this lawsuit."

▇ The petitioners note that in releasing three documents claimed to have been inadvertently withheld, "the attorney general wrote that the reason for the releases was for the 'purpose of responding to allegations in your Petition.'" They argue, "It is apparent that had no petition been filed, the documents would not have been released." Those documents, however, were released in February 2008, prior to the filing of an appearance in the case by Attorney Arthur Cunningham on March 5, 2008. We have held that attorney's fees are not awardable to "a *pro se* litigant who does not incur any obligation to pay for an attorney." *Emerson v. Town of Stratford*, 139 N.H. 629, 632 (1995); *cf. ATV Watch*, 155 N.H. at 442 (attorney's fees not

awardable under RTK law when petitioner "was not represented by counsel until after [the agency] disclosed all the documents to which [the petitioner] was entitled").

The petitioners assert that they were represented by Attorney Cunningham prior to February 2008. They cite Attorney Cunningham's affidavit in which he averred that he was consulted as early as November 16, 2007, about "a potential lawsuit" and that he reviewed a draft of the petition. The petitioners argue that "[t]he law does not require that an attorney file an appearance before the release [of documents] — just that one be retained." They cite *ATV Watch*, in which we stated that the RTK law's plain language "indicates that the legislature intended for a petitioning party to recover attorney's fees when retention of legal counsel is necessary to secure access to public documents." *ATV Watch*, 155 N.H. at 442.

Attorney Cunningham's affidavit, however, does not indicate when he was "retained" for purposes of an award of attorney's fees; namely, when the petitioners "incur[red] any obligation to pay for an attorney." *Emerson*, 139 N.H. at 632. Consultation notwithstanding, Cunningham's affidavit states that he filed his appearance on March 5, 2008, "and ha[s] represented Mr. Walters and ATV Watch since that date." The trial court ruled that the "petitioners have not established grounds for assessment of counsel fees." On appeal, the petitioners have failed to demonstrate that the record does not support that finding.

*Affirmed.*

DALIANIS, C.J., and DUGGAN and LYNN, JJ., concurred.