Rockingham
No. 2011-174 `

SAY PEASE IV, LLC *& a.*

v.

NEW HAMPSHIRE DEPARTMENT OF REVENUE ADMINISTRATION

Argued: November 10, 2011
Opinion Issued: March 23, 2012

*Casassa and Ryan*, of Hampton (*John J. Ryan* on the brief and orally), for the petitioners.

*Michael A. Delaney*, attorney general (*Matthew G. Mavrogeorge*, assistant attorney general, on the brief and orally), for the New Hampshire Department of Revenue Administration.

HICKS, J. The New Hampshire Department of Revenue Administration (DRA) appeals an order of the Superior Court (*McHugh*, J.) that reversed DRA's decision assessing a real estate transfer tax against the petitioners, Say Pease, LLC (Say Pease) and Say Pease IV, LLC (Say Pease IV). *See* RSA 78-B:1 (2003). We affirm.

The parties stipulated to the following facts. Two International Group, LLC (TIG) is a real estate holding company. It owns a ground lease on property near Pease International Tradeport that it wanted to use to secure a $10.5 million mortgage loan. To obtain the loan, TIG's prospective lender required that TIG, and all of its members, be "single purpose bankruptcy remote entities." This requirement would ensure that creditors other than the prospective lender would be unable to reach the property securing the mortgage loan. Say Pease, holder of a 47.5% interest in TIG and its managing member at the time, was not a single purpose bankruptcy remote entity because it held interests in entities other than TIG.

To comply with the lender's requirement, the members of Say Pease formed Say Pease IV, a new limited liability company (LLC) with the same members. Say Pease IV's LLC agreement provides that it was "formed for the sole purpose of being a Managing Member and Member of [TIG]" and was not authorized "to engage in any other activity[,] business or undertaking so long as [TIG] shall be indebted under any mortgage or other securitized loan."

Next, Say Pease's interest in TIG was transferred to Say Pease IV, and Say Pease IV replaced Say Pease as TIG's managing member. As a result of these transactions, Say Pease IV owned a 47.5% interest in TIG as a sole purpose remote bankruptcy entity, Say Pease held no interest in TIG, and TIG obtained the $10.5 million mortgage loan.

Based upon this transfer, DRA issued notices assessing the real estate transfer tax against Say Pease and Say Pease IV. After appealing unsuccessfully through DRA's administrative appeal process, Say Pease and Say Pease IV appealed to the superior court.

The parties filed cross-motions for summary judgment, and the trial court reversed DRA's order, ruling that the transfer at issue was not a "[c]ontractual transfer," RSA 78-B:1-a, II (2003), and, therefore, the real estate transfer tax did not apply. *See* RSA 78-B:1, I(a); RSA 78-B:1-a, V (Supp. 2011). Following our decision in *First Berkshire Business Trust v. Commissioner, New Hampshire Department of Revenue Administration*, 161 N.H. 176 (2010), DRA moved for reconsideration. The trial court upheld its initial order, and further ruled that the transaction was exempt from the transfer tax as a "[n]oncontractual transfer." RSA 78-B:1-a, III (2003); *see* RSA 78-B:2, IX (2003). This appeal followed.

We review the trial court's rulings on summary judgment by considering the affidavits and other evidence in the light most favorable to the non-moving party. *First Berkshire Bus. Trust*, 161 N.H. at 179. If this review does not reveal any genuine issues of material fact, *i.e.*, facts that would affect the outcome of the litigation, and if the moving party is entitled to judgment as a matter of law, we will affirm. *Id*. We review the trial court's application of law to the facts *de novo*. *Id*.

Resolving the issues on appeal requires statutory interpretation. In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Id*. We review the trial court's statutory interpretation *de novo*. *Id*. at 180. When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used. *Id*. We read words or phrases not in isolation, but in the context of the entire statute and the entire statutory scheme. *Id*. When the language of a statute is plain and unambiguous, we do not look beyond it for further indications of legislative intent. *Id*. We construe an ambiguous tax statute against the taxing authority rather than the taxpayer. *Id*. However, we do not strictly construe statutes that impose taxes, but instead examine their language in light of their purposes and objectives. *Id*.

As an initial matter, the parties disagree about the meaning of a stipulation that "through an Assignment and Consent to Assignment Agreement . . . Say Pease IV, LLC bec[a]me the holder of the 47.50%

interest in TIG." DRA contends that this stipulation means Say Pease, as an entity, transferred its interest in TIG to Say Pease IV; the petitioners argue that Say Pease's members, as individuals, made the transfer. Because we ultimately conclude that the transfer was not taxable, we will assume, without deciding, that DRA's position is correct and Say Pease, as an entity, was the transferor.

Turning to the assessment of the tax, the parties do not dispute that the transferred interest in TIG is an interest in a real estate holding company and, therefore, presumptively taxable. *See* RSA 78-B:1-a, V. Indeed, the only issue in the case is whether the transfer is a "[c]ontractual transfer" within the meaning of RSA 78-B:1-a, II.

Under RSA 78-B:1, I(a), "[e]ach sale, grant and transfer of real estate, and each sale, grant and transfer of an interest in real estate shall be presumed taxable unless it is specifically exempt from taxation under RSA 78-B:2." RSA 78-B:1-a, V defines a sale, grant and transfer as "every contractual transfer of real estate, or any interest in real estate from a person or entity to another person or entity, whether or not either person or entity is controlled directly or indirectly by the other person or entity." A contractual transfer is "a bargained-for exchange of all transfers of real estate or an interest therein." RSA 78-B:1-a, II.

RSA chapter 78-B does not define "bargained-for exchange," but in *First Berkshire Business Trust*, 161 N.H. at 181, we said that a bargained-for exchange is an element of "consideration," which is "the exchange of money, or other property and services, or property or services valued in money for an interest in real estate." *First Berkshire Bus. Trust*, 161 N.H. at 181 (quotation omitted); *see* RSA 78-B:1-a, IV (2003). That case involved two transactions where one company transferred property to another company with the same ownership in exchange for "Ten Dollars and other good and valuable consideration." *First Berkshire Bus. Trust*, 161 N.H. at 177-79 (quotation and ellipses omitted). In both transactions, we held that the real estate transfer tax applied to the extent of the property's full fair-market value. *Id.* at 183. We noted that, although consideration requires that something be given for the real estate interest, the parties need not exchange "adequate value." *Id.* at 182. Moreover, we held that "arm's length" bargaining is unnecessary to engage in a bargained-for exchange. *Id.* at 181.

To determine whether the transfer of the TIG interest was contractual, we examine whether Say Pease made the transfer in exchange for "money or other property and services or property or services valued in money." *Id.* (quotation omitted). DRA argues that, although no money was

exchanged when Say Pease IV replaced Say Pease as TIG's managing member, the transfer was contractual because Say Pease IV provided consideration in other forms.

■ First, DRA contends that, because mutual members of Say Pease and Say Pease IV exchanged consideration among themselves in the LLC agreement that formed Say Pease IV, there was consideration for the later transfer of the TIG interest. This argument fails because the consideration that the members exchanged, as individuals, to form a binding LLC agreement was not given in exchange for the later transfer between the entities Say Pease and Say Pease IV. The LLC and its members are two separate legal entities, and we must view them as such. *See* RSA 304-C:25 (2005) (discussing liability of LLC members); *cf. Petition of Lorden*, 134 N.H. 594, 600 (1991) ("[T]he stockholders and the corporation are two separate legal entities, and we must view them as such . . . ."), *superseded on other grounds by* Laws 1992, 203:1.

■ In this case, the members of Say Pease, in their capacities as founders of Say Pease IV, exchanged consideration among themselves to form a binding LLC agreement, but they gave nothing to Say Pease, as an entity, because Say Pease was not a party to the agreement. Since Say Pease received nothing, it was impossible for Say Pease to transfer its interest in TIG "in exchange for" the consideration its members recited in an agreement ostensibly unrelated to the later transfer. *See* RSA 78-B:1-a, IV. Absent some benefit to Say Pease in exchange for the transfer, the mutual consideration recited in Say Pease IV's LLC agreement fails to render transfer of the TIG interest contractual for purposes of the real estate transfer tax.

Moreover, although DRA must "look to the substance of the transaction or series of transactions" to determine if a taxable transfer has occurred, RSA 78-B:9, II (2003), here, there is no evidence that the obligations the members assumed in Say Pease IV's LLC agreement were undertaken "in exchange for" the later transfer. The agreement purported to create mutual obligations among the members to use "commercially reasonable efforts to further the interests of the Company," but made no mention of a requirement that any member transfer property to Say Pease IV. The parties here did not employ a business entity as a shield for an otherwise taxable exchange of value for an interest in property. To the contrary, the members who executed Say Pease IV's LLC agreement sought to *maintain TIG's original ownership* while placing it in a suitable financing vehicle; the promises exchanged related to the creation of the financing vehicle, Say Pease IV, not the subsequent property transfer. Thus, the substance of the transaction here fails to create a bargained-for exchange

because there was no "exchange of money, or other property and services, or property or services valued in money for an interest in real estate." *First Berkshire Bus. Trust*, 161 N.H. at 181 (quotation omitted).

We also reject DRA's argument that there was consideration in the form of Say Pease IV's "promise" not to engage in activities other than managing TIG. To the extent Say Pease IV made such a promise, it was an accommodation to TIG's lender, not consideration for the transfer. "A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." RESTATEMENT (SECOND) OF CONTRACTS § 71(2), at 172 (1981). Here, Say Pease did not transfer the property because it wanted Say Pease IV to limit the scope of its business. Rather, Say Pease made the transfer and Say Pease IV made the promise in order to secure a loan for TIG. Although the parties may have undertaken certain obligations to obtain the loan, these obligations were not "exchanged" for the transfer of the interest in TIG, but constituted steps in a transaction calculated to enable TIG to obtain the loan.

Moreover, contrary to DRA's argument, *First Berkshire Business Trust*, 161 N.H. at 183, does not require us to conclude that, because the transfer enabled TIG to obtain a mortgage loan, the "tangible benefits afforded" by the transaction created a bargained-for exchange. In *First Berkshire Business Trust*, we held that DRA could assess the transfer tax on the full fair-market value of the property transferred because "DRA reasonably could have determined that the tangible benefits afforded [by the transfer] far exceeded the ten dollar purchase price." *First Berkshire Bus. Trust*, 161 N.H. at 183. In one of the transactions in that case, a parent company, which owned both the transferor and the recipient of a piece of real property, "obtain[ed] better repayment terms" because of the transfer. *Id.* at 179.

We held that the owner's ability to refinance afforded "tangible benefits" to the transferor company, and that these tangible benefits constituted the "actual consideration" for the transfer. *Id.* at 183; *see* RSA 78-B:9, III (2003). Although the opinion did not explicitly discuss how the owner's ability to refinance tangibly benefitted the transferor company, the reason is self-evident. In that case, the two successive transferee companies were wholly-owned subsidiaries of the original owner of the property. *First Berkshire Bus. Trust*, 161 N.H. at 178. Because the owner directly benefitted and exercised exclusive control over each successive transferee, DRA could reasonably infer that, roughly speaking, each transfer was made "in exchange for" the benefit that its owner received. *See id.* at 183.

Thus, two elements enabled us to find consideration in *First Berkshire Business Trust*: (1) there was a complete identity of interest between the transferor company and its owner; and (2) the owner directly and tangibly benefitted from the transfer of real property. Presented with these two elements, we held that DRA could reasonably infer that the "substance of the transaction" was a transfer by the transferor company to obtain the benefit its owner received, and that DRA could assess the transfer tax based upon this benefit. RSA 78-B:9, II.

In this case, although Say Pease's members owned it entirely, they received no direct benefit from the transaction. The members did not transfer the TIG interest to obtain better repayment terms for themselves, as was the case in *First Berkshire Business Trust*, but to benefit TIG. *See First Berkshire Bus. Trust*, 161 N.H. at 179. TIG obtained the mortgage loan, and the members of Say Pease, the transferor entity received no direct benefit at all. To the extent that Say Pease's members benefitted as a result of TIG receiving the mortgage loan, they did so in their capacities as members of Say Pease IV. Unlike the owner in *First Berkshire Business Trust*, the only benefit the members in this case arguably received resulted from their ownership of the *transferee company*.

Such an attenuated benefit to the transferee company, however, cannot serve as consideration for the transfer. In *First Berkshire Business Trust*, because tangible benefits flowed directly to the transferor company's owner, we held that the transferor benefitted as well. *See First Berkshire Bus. Trust*, 161 N.H. at 183. Here, DRA urges that there is a bargained-for exchange because TIG benefitted by obtaining a mortgage loan, which in turn benefitted Say Pease IV, which in turn benefitted Say Pease IV's members. This benefit, DRA argues, must be imputed to Say Pease, the transferor company, because its members own an interest in the true "beneficiary" of the transfer, TIG.

We are not inclined to extend *First Berkshire Business Trust's* reach to permit DRA to trace the benefits through multiple layers of ownership back to an original transferor. When a complete identity of interest between a beneficiary and the transferor exists, imputing the benefits one receives to the other, as we did in *First Berkshire Business Trust*, is supportable. But here, given the attenuated relationship between the beneficiary, TIG, and the transferor, Say Pease, there is no reason to assign the benefits that one entity received to the other.

■ Thus, we reject DRA's argument that, in light of *First Berkshire Business Trust*, upholding the trial court's decision in this case leads to an absurd result. There is nothing absurd about the distinction we draw today. *First Berkshire Business Trust*, 161 N.H. at 182-83, held that if a

transaction directly benefits the owner of a subsidiary transferor company, the benefit may constitute consideration, and DRA can tax the transfer. Here, we simply say that, if there is no direct benefit to the party controlling a transferor entity, the transfer tax does not apply.

Because we uphold the trial court's finding that the transaction here was not a contractual transfer, we need not address whether it also falls within the separate, non-contractual transfer exemption under RSA 78-B:1-a, III and RSA 78-B:2, IX.

*Affirmed.*

CONBOY and LYNN, JJ., concurred; DALIANIS, C.J., dissented.

DALIANIS, C.J., dissenting. Because I believe the court's decision departs from *First Berkshire Business Trust v. Commissioner, New Hampshire Department of Revenue Administration*, 161 N.H. 176 (2010), and will create unnecessary confusion, I, respectfully, dissent.

*First Berkshire Business Trust*, 161 N.H. at 182-83, analyzed two transfers. In the first, a parent company transferred property to its wholly-owned subsidiary in exchange for ten dollars, and the parent avoided bankruptcy as a result. *First Berkshire Business Trust*, 161 N.H. at 178-79. In the second, the subsidiary transferred the same property to another wholly-owned subsidiary for ten dollars because the parent anticipated that such a transfer would be necessary to refinance. *Id.* at 179. We held that both transfers were bargained-for exchanges and that the consideration included the "tangible benefits" that resulted. *Id.* at 182-83.

In so holding, we expanded the common law definition of the term "bargained-for exchange" in the context of the real estate transfer tax. This expansion was necessary because the real estate transfer tax clearly permits taxation of transfers involving commonly-controlled business entities and their controllers, which I will refer to as *First Berkshire* transfers; however, such transfers often involve neither a bargain nor an exchange. Indeed, when a single group or entity controls all parties to a real estate transfer, bargaining is unnecessary.

*First Berkshire Business Trust* resolved the tension between the transfer tax's use of the term "bargained-for exchange" and its requirement that *First Berkshire* transfers be taxed by formulating a simple, predictable rule: Tangibly beneficial *First Berkshire* transfers are taxable based upon the fair-market value of the transferred property. *See id.* I believe the majority's decision today, by focusing upon the degree of attenuation between the transferor entity and the resulting benefit, departs from this rule and will create confusion concerning when the tax applies. More importantly, however, I believe the majority's interpretation of the relevant

statutes frustrates the legislature's intent to tax the type of transfers that occurred in *First Berkshire Business Trust*. I begin my analysis by interpreting the relevant statutes according to their plain meanings. *See ATV Watch v. N.H. Dep't of Transp.*, 161 N.H. 746, 752 (2011).

The legislature's intent to tax *First Berkshire* transfers is most evident in the "[c]ontractual transfer" and "[n]oncontractual transfer" definitions in RSA 78-B:1-a, II, III (2003). Contractual transfers are presumed taxable, unless an exemption applies, *see* RSA 78-B:1, I(a) (2003); RSA 78-B:1-a, II, V (Supp. 2011), while non-contractual transfers are exempt. RSA 78-B:2, IX (2003). The use of these terms suggests that the legislature intended all transfers to be either one or the other. The prefix "non-" means "not," "reverse of" or "absence of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1535 (unabridged ed. 2002). Thus, when the statute says "[n]oncontractual transfer," it means "not a '[c]ontractual transfer.'" RSA 78-B:1-a, II, III. Likewise, "[c]ontractual transfer[s]" can be defined as "not '[n]oncontractual transfer[s].'" RSA 78-B:1-a, II, III. Transfers falling outside one category simply belong in the other category and vice versa.

The statute defines "[c]ontractual transfer" as "a bargained-for exchange of all transfers of real estate or an interest therein." RSA 78-B:1-a, II. A "[n]oncontractual transfer," by contrast, is a "transfer which satisfies the 3 elements of a gift," *i.e.*, "[d]onative intent," "[a]ctual delivery" and "[i]mmediate relinquishment of control." RSA 78-B:1-a, III.

In this way, although the statute does not define "bargained-for exchange," when read within the statutory scheme, the term means "a non-gift transfer." Under this definition, transfers among commonly-controlled business entities will normally be contractual because such transfers rarely result in the "relinquishment of control" required to make a gift. RSA 78-B:1-a, III(c). *First Berkshire Business Trust* provides two examples. The first transfer in that case, from the parent to its wholly-owned subsidiary, lacked a relinquishment of control because the parent company controlled the property both before and after the transfer. *See First Berkshire Business Trust*, 161 N.H. at 178-79. In that case's second transfer, from one of the parent's wholly-owned subsidiaries to another, the parent similarly retained control throughout because it controlled both subsidiaries. *See id.* The same is true here.

Although the interest in TIG transferred from Say Pease to Say Pease IV, the members of the two entities always controlled the TIG interest. Because none of these transfers involves a relinquishment of control, none "satisfies the 3 elements of a gift transfer." RSA 78-B:1-a. Therefore, none is non-contractual. Thus, all are, necessarily, contractual and, therefore, taxable.

Further evidence that the legislature intended to tax *First Berkshire* transfers is found in the definition of a taxable "[s]ale, granting and transfer." RSA 78-B:1-a, V. Those terms specifically include "every contractual transfer of real estate, or any interest in real estate from a person or entity to another person or entity, whether or not either person or entity is controlled directly or indirectly by the other person or entity in the transfer." *Id.* The legislature also clarified that it intended to reach these transfers regardless of the form the relationship between the controller and controlled entity assumed. Indeed, the term "[c]ontractual transfer" specifically includes "bargained-for exchange[s] of all transfers of real estate . . . [f]rom a shareholder to a corporation in which he holds an interest," "[f]rom a partner to the partnership in which he holds an interest," and "[f]rom any other interest holder to an organization in which he owns an interest." RSA 78-B:1-a, II.

Thus, the rule that the transfer tax statutory scheme requires, and the rule that *First Berkshire Business Trust* impliedly adopted, is that beneficial transfers of property from a controller to a controlled entity or among commonly-controlled entities, *i.e., First Berkshire* transfers, are contractual. *See First Berkshire Business Trust*, 161 N.H. at 182-83. Although *First Berkshire Business Trust* did not expressly apply this analysis, it follows from the case's application of the rule that "arm's length bargaining" is not required for a transaction to constitute a bargained-for exchange. *See id.* at 181-83. Not only were the transfers in *First Berkshire Business Trust* not arm's length bargains, they were not bargains at all. "In the typical bargain, the consideration . . . induces the making of the promise and the promise induces the furnishing of the consideration." RESTATEMENT (SECOND) OF CONTRACTS § 71 comment *b* at 173 (1981). Obviously in *First Berkshire Business Trust*, the transferor entities did not furnish the property to the transferees to induce a "promise" that bankruptcy would be avoided or that more favorable financing terms would result. *See First Berkshire Business Trust*, 161 N.H. at 178-79, 183. The transferees had no power to make such a promise. Nor is it likely that the furnishing of ten dollars induced the transferor entities to transfer the property. *See id.* at 182.

To the contrary, these transfers were not common law bargained-for exchanges, and we did not analyze them under a common law definition. *See id.* Rather, we emphasized that statutory language required that these types of transfers be taxed and adjusted the definition of "bargained-for exchange" to make taxation possible. *Id.* at 181-82. This was the only way to give effect to the statutory language analyzed above. Thus, in my view, the relevant inquiry under *First Berkshire Business Trust* relates to the

type of transfer, not, as the majority appears to conclude, the relationship between the resulting benefits and the transferor entity. *See id.*

Moreover, the rule we adopted, that beneficial *First Berkshire* transfers are taxable events, was clear, predictable and faithful to the language of the real estate transfer taxation scheme. The rule was also workable because it reduced the practical difficulties that determining whether a *First Berkshire* transfer was "bargained-for" might entail. In *First Berkshire* transfers, in which the transferor and transferee are essentially the same people, the parties will seldom create evidence that they formed a contract, or "bargained," so as to trigger the real estate transfer tax. Rather, they will structure transfers to conceal the consideration exchanged.

For example, if an owner, who controls a corporation as its sole shareholder and director, wished to transfer real property to the corporation and to receive money in return, in order to avoid the tax, the owner could simply "give" the property to the corporation and compel the corporation to declare a dividend in the owner's favor. *See* RSA 293-A:6.40 (2010) (discussing corporate rights to declare dividends). By forcing the corporation to pay a dividend, the controller would avoid bargaining, but still achieve the desired result — the owner receiving money and the corporation getting the property. Controllers could employ numerous variations on this theme to defeat the tax and frustrate the legislature's intent to tax *First Berkshire* transfers.

To close this loophole, DRA would have to prove that such transfers were actually bargains or, under the majority's interpretation, that the transfer somehow tangibly benefitted the transferor. Such proof could be hard to obtain. The controller would have no reason to admit that the dividend was, in fact, consideration for the transferred property, and such a transaction would produce no evidence of its true nature. Further, under the majority's interpretation, benefits that resulted from the corporation's receipt of the property would be "too attenuated" from the transferor-controller to warrant assessment of the tax.

Under *First Berkshire Business Trust's* rule, however, the transfer would be taxable as long as one of the parties benefitted in some way. *See First Berkshire Business Trust*, 161 N.H. at 182-83. Thus, the increase in the corporate value resulting from the transfer would tangibly benefit the transferor as sole shareholder because the transferor's equity would also increase in value. The technical distinctions among the layers of ownership would not prevent assessment of the tax.

I believe that the majority replaces this clear, predictable and workable rule with a technical doctrine that focuses upon the very distinctions that *First Berkshire Business Trust* disregarded. Rather than facilitating taxation of *First Berkshire* transfers, the majority enables commonly-

controlled entities to avoid the tax by structuring transfers to include additional layers of ownership. This distinction, in my view, lacks a basis in the text of the real estate transfer tax.

Instead, it seems to be derived by parsing *First Berkshire Business Trust's* language and inserting analysis that did not appear in the opinion. The relevant fact in *First Berkshire Business Trust* was not the degree of attenuation between the transferor entity and the "beneficiary" of the transfer, but the presence of transfers upon which the statute imposes a tax. Language in that opinion suggesting that the transferors benefitted from the transactions did not impute benefits that other parties received to the transferors, but was simply shorthand for the fact that the transfers were tangibly beneficial overall. *See id.* at 183. Indeed, all of the parties in both transactions were essentially the same "people," *i.e.*, the controllers of the parent that, in turn, controlled both subsidiaries. *Id.* at 178. Therefore, I fail to understand why assessment of the tax turns upon technical distinctions concerning which of the controllers' "identities" ultimately benefitted and the closeness of relationship between the "beneficiary identity" and "transferor identity."

Moreover, since the majority offers no guidance as to the degree of "attenuation" necessary to avoid the tax, this new rule will, I believe, complicate matters for parties wishing to engage in *First Berkshire* transfers. Under the *First Berkshire Business Trust* rule, these parties could anticipate the assessment of the transfer tax and fold additional expenses into whatever refinancing or reorganization they planned. Now, they must guess whether the tax will apply and the number of additional ownership layers they must create to circumvent the tax. This lack of predictability will, in my view, create new costs in *First Berkshire* transfers that our previous rule would avoid.

Therefore, rather than analyzing the degree of attenuation, I would simply apply the rule enunciated by *First Berkshire Business Trust* and hold that, because the transfer at issue here involved commonly-controlled entities and created tangible benefits, it was "bargained-for." The members of Say Pease and Say Pease IV benefitted from the transfer at issue because the transfer enabled TIG to obtain a $10.5 million mortgage loan. This loan benefitted not only TIG, but also Say Pease's members, who still held interests in TIG through Say Pease IV. As a result, just as in *First Berkshire Business Trust*, 161 N.H. at 179, 181, a tangible benefit in the form of a financing option provided consideration for the transfer of an interest in real property, and the transfer, I believe, constituted a bargained-for exchange.