Strafford
No. 2010-412

## DAVID MONTENEGRO

v.

## CITY OF DOVER

Submitted: June 16, 2011
Opinion Issued: November 2, 2011

David Montenegro, by brief, *pro se.*

*Allan B. Krans,* of Dover, by brief, for the City of Dover.

HICKS, J. The petitioner, David Montenegro, appeals an order of the Superior Court (*Brown,* J.) denying his petition under the Right-to-Know Law, RSA ch. 91-A (2001 & Supp. 2010), requesting disclosure of information pertaining to certain surveillance equipment and procedures under the control of the respondent, the City of Dover (City). We affirm in part, reverse in part and remand.

The following facts are recited in the trial court's order or are supported in the record. The petitioner filed a request with the City on January 14, 2010, seeking the disclosure of: (1) the precise locations of the City's surveillance equipment; (2) the recording capabilities for each piece of equipment; (3) the specific time periods each piece of equipment is operational; (4) the retention time for any recordings; and (5) the job titles of those who monitor the recordings.

On January 21, the City denied his request on the basis that "it would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions." In addition, the City stated that "disclosure could reasonably be expected to risk circumvention of the law." Nevertheless, the City represents that it disclosed to the petitioner: the general location and buildings where cameras are, or are proposed to be, sited; the number of cameras in or around each site; "[t]he capability and intent of the Dover Police to monitor cameras from remote locations"; the "intent of the Dover Police *not* to monitor the cameras on a regular basis," but to view them as needed when it would assist in law enforcement; "[t]he cost of the security

equipment"; "[t]he names of the vendors installing the security equipment"; "[t]he contracts for installing the security equipment"; and when the equipment was installed.

Subsequently, the petitioner filed a petition with the superior court, seeking the information he had requested from the City. On March 26, the trial court held a hearing at which the City provided the court with a *Vaughn* index describing each document withheld or redacted, and justifying the reason for nondisclosure. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973); *Union Leader Corp. v. N.H. Housing Fin. Auth.*, 142 N.H. 540, 548-49 (1997) (discussing use of *Vaughn* index). The court found that the City had sustained its burden of justifying withholding the precise locations of the City's surveillance equipment, the type of recording capabilities for each piece of equipment, the specific time periods each piece of equipment is expected to be operational, and the retention time for any recordings. The court also found the job titles of those who monitor the surveillance recordings exempt from disclosure as "internal personnel practices" pursuant to RSA 91-A:5, IV (Supp. 2010).

On appeal, the petitioner argues that: (1) the federal Freedom of Information Act (FOIA), 5 U.S.C. §§ 552 *et seq.*, does not control requests for governmental records pursuant to our Right-to-Know Law; (2) Part I, Article 8 of the New Hampshire Constitution and RSA chapter 91-A hold the government to a "higher standard of public accountability" than does the FOIA; (3) disclosure of the information requested could not reasonably be expected to interfere with enforcement proceedings, risk circumvention of the law, or endanger the life or physical safety of any individual; (4) the job titles of those allowed to monitor the surveillance recordings are not exempt from disclosure under RSA 91-A:5, IV; (5) people conducting their private affairs in public buildings have the right to know how those activities are monitored; and (6) the operation of hidden cameras for routine surveillance of the public by local government violates Part I, Article 8 of our constitution.

■ "Resolution of this case requires us to interpret the Right-to-Know Law, which is a question of law that we review *de novo*." *ATV Watch v. N.H. Dep't of Transp.*, 161 N.H. 746, 752 (2011) (quotation and ellipsis omitted). "When interpreting a statute, we first look to the plain meaning of the words used and will consider legislative history only if the statutory language is ambiguous." *Id.* (quotation omitted). We do not consider words and phrases in isolation, but rather within the context of the statute as a whole. *In the Matter of Scott & Pierce*, 160 N.H. 354, 360 (2010). This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced

by the statutory scheme. *Id.* "The purpose of the Right-to-Know Law is to ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people." *N.H. Civil Liberties Union v. City of Manchester*, 149 N.H. 437, 438 (2003) (quotation omitted). Thus, the Right-to-Know Law helps further our state constitutional requirement that the public's right of access to governmental proceedings and records shall not be unreasonably restricted. *Id.*; *see* N.H. CONST. pt. I, art. 8.

The petitioner first argues that the trial court erred because the FOIA "does not control" requests for New Hampshire governmental records under the Right-to-Know Law. The trial court, however, did not apply the FOIA in this case, but rather concluded that the requested information "fit[] squarely within exemptions (A), (E), and (F) as laid out in *Murray* [v. N.H. Div. of State Police, 154 N.H. 579, 582 (2006)]." While the test employed in *Murray* is admittedly one we adopted from the FOIA, use of the *Murray* test does not constitute an application of federal law. Rather, in interpreting and applying our own Right-to-Know Law, we "look to the decisions of other jurisdictions, since other similar acts, because they are *in pari materia*, are interpretively helpful, especially in understanding the necessary accommodation of the competing interests involved." *Murray*, 154 N.H. at 581 (quotation omitted).

The petitioner further argues that the trial court erred in applying *Murray* and its predecessor, *Lodge v. Knowlton*, 118 N.H. 574 (1978), because, by doing so, it "appears to have treated the requested information as part of a law enforcement investigation or prosecution." He asserts that his request sought "no investigatory information."

In *Lodge*, we adopted "the six-prong test of 5 U.S.C. § 552(b)(7) (Supp. 1975) . . . for the guidance of our judges who may be faced with" cases dealing with "police investigatory files." *Lodge*, 118 N.H. at 577. We determined that the FOIA test "provides a good standard to effectuate the balance of interests required by RSA [chapter] 91-A with regard to" such files. *Id.* At the time, the test exempted, under certain circumstances, "investigatory records compiled for law enforcement purposes." *Id.* at 576 (quotation omitted).

In 1986, Congress amended 5 U.S.C. § 552(b)(7) by deleting the word "investigatory" and inserting the words "or information," so that protection is now available to all "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7) (2006); *see Abdelfattah v. United States Dep't of Homeland Sec.*, 488 F.3d 178, 184 (3d Cir. 2007). In *Murray*, we employed this amended test, which exempts:

*"records or information compiled for law enforcement purposes,* but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual . . . ."

*Murray*, 154 N.H. at 582 (quoting 5 U.S.C. § 552(b)(7) (2002)) (emphasis added).

■ The petitioner correctly points out that even though *Murray* quoted the amended FOIA test, it applied a requirement from the pre-amendment *Lodge* case; namely, that "[t]he entity resisting disclosure under exemption (A) must initially show that the requested documents are: (1) investigatory; and (2) compiled for law enforcement purposes." *Id.*; *see Lodge*, 118 N.H. at 576-77. Recitation of this apparent vestige was of no consequence in *Murray*, however, because "[t]he petitioner [did] not challenge the trial court's findings that the requested documents [were] investigatory in nature and that they were [compiled] for law enforcement purposes." *Murray*, 154 N.H. at 582. We now clarify that in *Murray*, we intended to adopt the amended test set out in 5 U.S.C. § 552(b)(7) (2006). Thus, to withhold materials under the modified test adopted in *Murray*, an agency need not establish that the materials are investigatory, but need only "establish that the records at issue were compiled for law enforcement purposes, and that the material satisfies the requirements of one of the subparts of" the test. *Richardson v. United States Dept. of Justice*, 730 F. Supp. 2d 225, 233 (D.D.C. 2010) (quotation omitted). Accordingly, even

accepting the petitioner's assertion that his request did not encompass investigatory files, we conclude that the trial court did not err in applying the *Murray* test.

Here, the petitioner does not challenge the trial court's implicit finding that the requested records were compiled for law enforcement purposes. *See Demers Nursing Home, Inc. v. R.C. Foss & Sons, Inc.*, 122 N.H. 757, 761 (1982) (noting "in the absence of specific findings, a court is presumed to have made all findings necessary to support its decree" (quotation omitted)). Therefore, the City has satisfied the initial prong of the test.

The petitioner challenges the trial court's finding that the information he requested was exempt from disclosure under sections (A), (E), and (F) of the *Murray* test, contending that disclosure would not interfere with enforcement proceedings, risk circumvention of the law or endanger the life or physical safety of any individual. The City counters that release of the precise locations of cameras, the type of recording capabilities for each piece of equipment, the specific time periods each piece of equipment is expected to be operational, and the retention time for any recordings "would provide a roadmap for the commission of crime." It argues that disclosure of detailed law enforcement surveillance procedures would allow suspects to draw conclusions about which monitoring techniques law enforcement routinely implements, and thus provide them with potential countermeasures to circumvent such practices. Looking again to cases construing the FOIA for guidance, *see Lamy v. N.H. Pub. Utils. Comm'n*, 152 N.H. 106, 108 (2005), we agree with the City.

In *Lewis-Bey v. United States Department of Justice*, 595 F. Supp. 2d 120 (D.D.C. 2009), the court addressed whether the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) properly withheld under section (E) "details of electronic surveillance techniques, specifically, the circumstances under which the techniques were used, the specific timing of their use, and the specific location where they were employed." *Lewis-Bey*, 595 F. Supp. 2d at 138 (quotation and ellipsis omitted). In holding that this information was correctly withheld, the court apparently accepted ATF's assertion that disclosure "would illustrate the agency's strategy in implementing these specific techniques" and thus "could lead to decreased effectiveness in future investigations by allowing potential subjects to anticipate and identify such techniques as they are being employed." *Id.* (quotations and ellipsis omitted).

In *New York Civil Liberties Union v. Department of Homeland Security*, 771 F. Supp. 2d 289 (S.D.N.Y. 2011), the plaintiff did not contest that the information it sought regarding "the placement of surveillance cameras in Lower Manhattan" by the New York City Police Department (NYPD) could be used to circumvent the law, but argued that disclosure would not

increase the risk of circumvention because NYPD's use of security cameras was already publicly known. *N.Y. Civil Liberties Union*, 771 F. Supp. 2d at 290, 291. The court disagreed, noting that "although it is publicly known that . . . [the NYPD] uses cameras . . . , the specific locations of those devices are unknown, and their disclosure could unquestionably aid criminals in evading detection and thereby circumventing the law." *Id.* at 292. Similarly, the court in *Showing Animals Respect and Kindness v. United States Department of the Interior*, 730 F. Supp. 2d 180 (D.D.C. 2010), noted that "although trespassers and poachers on Wildlife Refuges likely know that they are subject to surveillance, the details of the surveillance techniques are unknown to them." *Showing Animals Respect and Kindness*, 730 F. Supp. 2d at 200. The court was therefore "satisfied that documents which disclose the location and timing of such surveillance could be reasonably expected to risk circumvention of the law." *Id.*

 We conclude that the precise locations of the City's surveillance equipment, the recording capabilities for each piece of equipment, the specific time periods each piece of equipment is expected to be operational, and the retention time for any recordings are exempt from disclosure. This information is of such substantive detail that it could reasonably be expected to risk circumvention of the law by providing those who wish to engage in criminal activity with the ability to adjust their behaviors in an effort to avoid detection. Accordingly, the release of such information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions" and "such disclosure could reasonably be expected to risk circumvention of the law." *Murray*, 154 N.H. at 582 (quotation omitted).

The petitioner nevertheless contends that *N.H. Civil Liberties Union* mandates disclosure of the information he seeks. He maintains that providing the information he requests is analogous to the "police surveillance tactics [that] were considered disclosable information" in that case. We disagree. In *N.H. Civil Liberties Union*, the petitioner sought access to consensual photographs of individuals stopped, but not arrested, that were taken by the Manchester Police Department. *N.H. Civil Liberties Union*, 149 N.H. at 438. The "trial court explicitly exempted from disclosure photographs that . . . were part of police investigations, including pictures of victims, witnesses and suspects." *Id.* at 441. Moreover, the issues of law raised in *N.H. Civil Liberties Union* are dissimilar to those presented in this case. *See id.* at 439-40. In an effort to withhold the photographs, the City of Manchester relied on the exemption in RSA 91-A:5, IV (2001) for records "whose disclosure would constitute invasion of privacy." *Id.* at 440

(quotation omitted). Here, the court upheld the withholding of the requested information under exemptions (A), (E), and (F) of the *Murray* test. In light of our ruling that these records were properly withheld under section (E), we need not further analyze the applicability of the other exemptions.

■ The petitioner also contends that Part I, Article 8 of the New Hampshire Constitution and RSA chapter 91-A hold government to a "higher standard" of public accountability than does the FOIA. Part I, Article 8 provides that "the public's right of access to governmental proceedings and records shall not be *unreasonably* restricted." N.H. CONST. pt. I, art. 8 (emphasis added). Because we cannot conclude that an exemption from disclosure for certain information that "could reasonably be expected to risk circumvention of the law," *Murray*, 154 N.H. at 582 (quotation omitted), is an *unreasonable* restriction on public access to governmental records, we find no conflict between the exemption applied here and Part I, Article 8 of the New Hampshire Constitution.

The petitioner next contends that the trial court erred by exempting from disclosure the job titles of any persons who monitor the City's surveillance equipment. The court found that the information was properly withheld under RSA 91-A:5, IV as records pertaining to "internal personnel practices." RSA 91-A:5, IV.

■ We construe provisions favoring disclosure broadly, while construing exemptions narrowly. *Murray*, 154 N.H. at 581. When a public entity seeks to avoid disclosure of material under the Right-to-Know Law, that entity bears a heavy burden to shift the balance toward nondisclosure. *Id.*

We first applied the "internal personnel practices" exemption of RSA 91-A:5, IV in *Union Leader Corp. v. Fenniman*, 136 N.H. 624, 626 (1993). There, the defendants sought to withhold documents compiled during an internal investigation of a Dover Police Department lieutenant accused of making harassing phone calls. *Fenniman*, 136 N.H. at 625-26. We concluded that such files were exempt from disclosure as "[r]ecords pertaining to internal personnel practices," under RSA 91-A:5, IV. *Id.* (quotation omitted). Finding that "the plain meanings of the words 'internal,' 'personnel,' and 'practices' are themselves quite broad," *id.*, we concluded that the investigatory files fell within the plain meaning of the statutory language: "These files plainly 'pertain[] to internal personnel practices' because they document procedures leading up to internal personnel discipline, a quintessential example of an internal personnel practice." *Id.* Similarly, in *Hounsell v. North Conway Water Precinct*, 154 N.H. 1 (2006), we found that a report generated in the course of investigating claimed employee

misconduct was a record pertaining to "internal personnel practices." *Hounsell*, 154 N.H. at 4 (quotation omitted).

■ We have not, however, had occasion to interpret RSA 91-A:5, IV outside the context of employee misconduct or discipline. Looking again to cases interpreting the FOIA for guidance, we find instructive the United States Supreme Court's recent interpretation of Exemption 2 under the FOIA, *see* 5 U.S.C. § 552(b)(2) (2006), "which shields from compelled disclosure documents related solely to the internal personnel rules and practices of an agency." *Milner v. Department of Navy*, 131 S. Ct. 1259, 1262 (2011) (quotation omitted). The Court ruled that "[a]n agency's 'personnel rules and practices' are its rules and practices dealing with employee relations or human resources. . . . They concern the conditions of employment in federal agencies — such matters as hiring and firing, work rules and discipline, compensation and benefits." *Id.* at 1265. In so doing, it rejected an interpretation adopted by the D.C. Court of Appeals that "Exemption 2 should also cover any predominantly internal materials whose disclosure would significantly risk circumvention of agency regulations or statutes." *Id.* at 1263 (quotations, citation, brackets and footnote omitted). In *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C.Cir. 1981), *abrogated by Milner v. Department of the Navy*, 131 S. Ct. 1259 (2011), the D.C. Circuit Court had "approved the use of Exemption 2 to shield a manual designed to train Government agents in law enforcement surveillance techniques." *Milner*, 131 S. Ct. at 1262. In *Milner*, the Supreme Court rejected the D.C. Circuit Court's interpretation and held that Exemption 2 "does not stretch so far" as to shield "data and maps used to help store explosives at a naval base in Washington State." *Id.*

■ In light of the foregoing, we conclude that the job titles of persons who monitor the City's surveillance equipment are not an "internal personnel practice[]" within the meaning of RSA 91-A:5, IV. They are not related to internal personnel discipline, which we found to be "a quintessential example of an internal personnel practice" in *Fenniman*. *Fenniman*, 136 N.H. at 626. Nor are they akin to "such matters as hiring and firing, work rules and discipline," which, among other things, the Supreme Court noted to be matters within the contemplation of Exemption 2 of the FOIA. *Milner*, 131 S. Ct. at 1265. Accordingly, we reverse the trial court's ruling with respect to the withholding of job titles of persons who monitor the City's surveillance equipment.

The petitioner next contends, making reference to "Federal constitutional law," that the City's failure to disclose the requested information implicates the privacy rights of private parties. He argues:

> While all New Hampshire citizens have a right to know the manner in which government conducts surveillance of the public, this right is particularly compelling when private parties utilize public buildings to conduct private affairs. Examples of this include rental or lease of city facilities for use by clubs, civic groups, and similar organizations.

We need not address this argument because the petitioner does not allege that he has "utilize[d] public buildings to conduct private affairs." Thus, he has not demonstrated standing to assert this claim. *See Gen. Elec. Co. v. Comm'r, N.H. Dep't of Revenue Admin.*, 154 N.H. 457, 461 (2006) ("The general rule in New Hampshire is that a party has standing to raise a constitutional issue only when the party's own rights have been or will be directly affected.").

Finally, the petitioner appears to argue that the operation of hidden cameras for routine surveillance of the public by local government violates Part I, Article 8 of the New Hampshire Constitution. Because this claim is not supported by an adequately developed legal argument, however, we need not address it further: "[N]either passing reference to constitutional claims nor offhand invocations of constitutional rights without support by legal argument or authority warrants extended consideration." *Petition of Lussier*, 161 N.H. 153, 159-60 (2010) (quotation omitted).

*Affirmed in part; reversed in part; and remanded.*

DALIANIS, C.J., and DUGGAN, CONBOY and LYNN, JJ., concurred.