NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2019-0135

SEACOAST NEWSPAPERS, INC.

v.

CITY OF PORTSMOUTH

Argued: November 20, 2019
Opinion Issued: May 29, 2020

Bernstein, Shur, Sawyer & Nelson, P.A., of Manchester (Richard C. Gagliuso on the brief and orally), and American Civil Liberties Union of New Hampshire, of Concord (Gilles R. Bissonnette and Henry R. Klementowicz on the brief), for the plaintiff.

Jackson Lewis P.C., of Portsmouth (Thomas M. Closson on the brief and orally), for the defendant.

Nolan Perroni, PC, of North Chelmsford, Massachusetts (Peter J. Perroni on the brief and orally), for the intervenor, New England Police Benevolent Association, Local 220.

DONOVAN, J. The plaintiff, Seacoast Newspapers, Inc., appeals an order of the Superior Court (Messer, J.) denying its petition to disclose an arbitration

decision concerning the termination of a police officer by the defendant, the City of Portsmouth. Seacoast primarily argues that we have previously misconstrued the "internal personnel practices" exemption of our Right-to-Know Law. See RSA 91-A:5, IV (2013). Today, we take the opportunity to redefine what falls under the "internal personnel practices" exemption, overruling our prior interpretation set forth in Union Leader Corp. v. Fenniman, 136 N.H. 624 (1993). As explained below, we conclude that only a narrow set of governmental records, namely those pertaining to an agency's internal rules and practices governing operations and employee relations, falls within that exemption. Accordingly, we hold that the arbitration decision at issue here does not fall under the "internal personnel practices" exemption, vacate the trial court's order, and remand for the trial court's consideration of whether, or to what extent, the arbitration decision is exempt from disclosure because it is a "personnel . . . file[ ]." RSA 91-A:5, IV. We also deny Seacoast's request for attorney's fees.

## I. Factual and Procedural History

The following facts are undisputed or supported by the record. In 2015, the City of Portsmouth terminated the employment of Aaron Goodwin, a former police officer with the Portsmouth Police Department. Following Goodwin's termination, the Portsmouth Police Ranking Officers Association, New England Police Benevolent Association, Local 220 (Union) filed a grievance on his behalf challenging the termination and seeking his reinstatement. Arbitration of the grievance was conducted in accordance with the Union's collective bargaining agreement and administered by an independent arbitrator. The final decision was issued in 2018.

Goodwin's alleged misconduct while employed by the Department has been the subject of significant media attention throughout New Hampshire and beyond, given the public's significant interest in learning about how its public officials resolve matters involving alleged breaches of trust and conflicts of interest by public employees and, in particular, police officers. To that end, a reporter employed by Seacoast submitted a written request to the City seeking access to a copy of the arbitration decision. The City agreed that it should be released to the public. However, the City's attorney informed the reporter that the City would not release the decision in light of the position taken by the Union that it was exempt from disclosure under the Right-to-Know Law's exemptions for "internal personnel practices" and "personnel . . . files." See RSA 91-A:5, IV.

In response, Seacoast filed a petition in superior court seeking to compel disclosure of the decision and requesting attorney's fees. It argued that the City had "not demonstrated any reasonable valid basis for denying access" to the decision. The City answered that it did not object to the relief sought by

Seacoast with the exception of its request for attorney's fees. However, the Union moved to intervene and the trial court granted its motion. The Union opposed Seacoast's petition, reiterating its position that both exemptions precluded disclosure of the decision. After a hearing and in camera review of the decision, the trial court concluded that it was exempt from disclosure under the "internal personnel practices" exemption. See RSA 91-A:5, IV. The trial court reasoned that the arbitration grievance "process was conducted internally and was performed for the benefit of . . . Goodwin and his former employer" and therefore bore "all the hallmarks of an internal personnel practice." The trial court therefore did not determine whether the decision is also exempt from disclosure because it is a personnel file. See RSA 91-A:5, IV. This appeal followed.

## II. Standard of Review

At the outset, we describe the appropriate standard of review in Right-to-Know Law matters. Part I, Article 8 of the New Hampshire Constitution provides that "the public's right of access to governmental proceedings and records shall not be unreasonably restricted." The Right-to-Know Law states that "[e]very citizen . . . has the right to inspect all governmental records . . . except as otherwise prohibited by statute or RSA 91-A:5." RSA 91-A:4, I (2013).

The ordinary rules of statutory construction apply to our interpretation of the Right-to-Know Law, and we therefore look to the plain meaning of the words used when interpreting the statute. Union Leader Corp. v. City of Nashua, 141 N.H. 473, 475 (1996). Ultimately, this court interprets the Right-to-Know Law with a view toward disclosing the utmost information in order to best effectuate our statutory and constitutional objective of facilitating access to public documents. Union Leader Corp. v. N.H. Housing Fin. Auth., 142 N.H. 540, 546 (1997). Accordingly, although the statute does not provide for unfettered access to public records, we broadly construe provisions in favor of disclosure and interpret the exemptions restrictively. Id. We also consider the decisions of courts in other jurisdictions because similar acts are in pari materia and interpretatively helpful. Id.

## III. Analysis

At issue here are two exemptions from disclosure set forth in the Right-to-Know Law for records pertaining to: (1) "internal personnel practices"; and (2) "personnel . . . files." RSA 91-A:5, IV. The trial court relied on the progeny of Fenniman in ruling that the arbitration decision is exempt because it is an internal personnel practice.

3

## A. "Internal Personnel Practices" Jurisprudence

In <u>Fenniman</u>, we broadly construed the "internal personnel practices" exemption to categorically exclude from disclosure records documenting a public agency's internal discipline of an employee. <u>Fenniman</u>, 136 N.H. at 626-27. Although we recognized that "we generally interpret the exemptions in [the Right-to-Know law] restrictively," we also stated that "the plain meanings of the words 'internal,' 'personnel,' and 'practices' are themselves quite broad." <u>Id</u>. at 626. As a result, we held that documents compiled during an internal investigation of a police department lieutenant accused of making harassing phone calls were "categorically exempt" from disclosure under the "internal personnel practices" exemption because "they document[ed] procedures leading up to internal personnel discipline, a quintessential example of an internal personnel practice." <u>Id</u>. at 625-27.

Our interpretation of the "internal personnel practices" exemption in <u>Fenniman</u> departed from our customary Right-to-Know Law jurisprudence in two significant ways. <u>Reid v. N.H. Attorney General</u>, 169 N.H. 509, 519-20 (2016). First, we failed to interpret the exemption narrowly and, second, we declined to employ a balancing test. <u>Id</u>. at 520; <u>see, e.g.</u>, <u>Lambert v. Belknap County Convention</u>, 157 N.H. 375, 382-86 (2008) (describing the balancing test employed to determine whether public records are exempt from disclosure because their release would constitute invasion of privacy). Our analysis in <u>Fenniman</u> had additional shortcomings, including its failure to consult decisions from other jurisdictions interpreting similar statutes, in particular, cases interpreting the federal Freedom of Information Act (FOIA) — an inquiry we make in cases requiring us to interpret certain provisions of the Right-to-Know Law and its failure to consider whether a broad interpretation of the "internal personnel practices" exemption might render any of the remaining statutory language redundant or superfluous — in particular, the language exempting "personnel . . . files." <u>Reid</u>, 169 N.H. at 520; <u>see</u> RSA 91-A:5, IV.

We subsequently applied the "internal personnel practices" exemption in <u>Hounsell v. North Conway Water Precinct</u>, 154 N.H. 1 (2006). There, we concluded that an internal investigatory report regarding allegations of threats and harassment made by an employee of the North Conway Water Precinct fell under the "internal personnel practices" exemption. <u>Id</u>. at 2, 4. Although the report was prepared by outside investigators, we relied on <u>Fenniman</u> and reasoned that "the investigation could have resulted in disciplinary action," and thus the report pertained to "internal personnel practices." <u>Id</u>. at 4. The <u>Hounsell</u> Court failed to analyze the "internal personnel practices" language or consider the import of RSA 91-A:5's other exemptions.[1]

---

[1] In <u>Montenegro v. City of Dover</u>, 162 N.H. 641, 649-50 (2011), we applied, for the first time, the "internal personnel practices" exemption outside the context of employee misconduct or discipline. Relying in part on <u>Fenniman</u>, we concluded that "the job titles of persons who monitor [a] City's surveillance equipment" did not fall within the exemption. <u>Id</u>. at 650.

Then, in Reid, 169 N.H. at 523, we limited the application of Fenniman's broad interpretation of the exemption. Although neither party in Reid asked us to overrule Fenniman, we pointed out the shortcomings of Fenniman's analysis of the exemption's language, as described above. Id. at 519-22. Accordingly, we declined to extend the holding of either Fenniman or Hounsell "beyond their own factual contexts" and instead "return[ed] to our customary standards for construing the Right-to-Know Law." Id. at 521-22. We clarified that to qualify "an investigation into employee misconduct as a personnel practice, . . . the investigation must take place within the limits of an employment relationship." Id. at 523. Applying this interpretation of the exemption, we held that the records of an investigation by the attorney general of a county attorney did not fall within the exemption because the attorney general was not the employer of the county attorney. Id. at 515, 525-26. We remanded for the trial court to determine whether the records fell under the exemption for personnel files. Id. at 527.

Most recently, in Clay v. City of Dover, 169 N.H. 681, 684, 688 (2017), we held that the completed rubric forms from a school superintendent search committee fell under the "internal personnel practices" exemption. Relying primarily on Reid, we concluded that "the completed rubric forms relate to hiring, which is a classic human resources function," and therefore "pertain to 'personnel practices.'" Id. at 686. We also determined that the forms were "internal" because "they were filled out by members of the school board's superintendent search committee on behalf of the school board, the entity that employs the superintendent." Id. at 687. Nowhere in Clay did we indicate that the parties had requested that we overrule our prior interpretation of the "internal personnel practices" exemption.

### B. Stare Decisis Analysis

On appeal, Seacoast argues that we misconstrued the Right-to-Know Law's "internal personnel practices" exemption in Fenniman and urges us to overrule that case. We have acknowledged that, in Fenniman, we departed from our customary Right-to-Know Law analysis. See Reid, 169 N.H. at 519-22. That recognition, in conjunction with Seacoast's request that we overrule Fenniman, triggers our stare decisis analysis. See State v. Quintero, 162 N.H. 526, 539 (2011).

Stare decisis, "the idea that today's Court should stand by yesterday's decisions," Kimble v. Marvel Entertainment, LLC, 135 S. Ct. 2401, 2409 (2015), commands great respect in a society governed by the rule of law, and we do not lightly overrule a prior opinion, State v. Duran, 158 N.H. 146, 153 (2008). "Thus, when asked to reconsider a holding, the question is not whether we would decide the issue differently de novo, but whether the ruling has come to be seen so clearly as error that its enforcement was for that very reason doomed." Id.

5

We will overturn a decision only after considering: (1) whether the rule has proven to be intolerable simply by defying practical workability; (2) whether the rule is subject to a kind of reliance that would lend a special hardship to the consequence of overruling; (3) whether related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine; and (4) whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification. Ford v. N.H. Dep't of Transp., 163 N.H. 284, 290 (2012). Although these factors guide our judgment, no single factor is dispositive. Id.

First, we recognize that a broad interpretation of the "internal personnel practices" exemption, which leads to a subset of public documents being categorically exempt from disclosure, is easily applied. Although Reid, 169 N.H. at 522-23, limited Fenniman's broad interpretation of the "internal personnel practices" exemption, we cannot conclude that the rule, as it stands, defies practical workability.

Second, we consider whether Fenniman's interpretation is subject to a kind of reliance that would lend a special hardship to the consequence of overruling it. See Ford, 163 N.H. at 290. "Reliance interests are most often implicated when a rule is operative 'in the commercial law context . . . where advance planning of great precision is most obviously a necessity.'" Quintero, 162 N.H. at 537 (quoting Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 855-56 (1992) (brackets omitted)). Such interests are not present here and the Union has identified no reliance interest implicated by Fenniman's interpretation.

Third, we consider whether related principles of law have developed such that the old rule is no more than a remnant of an abandoned doctrine. Ford, 163 N.H. at 290. Fenniman is an outlier in our Right-to-Know Law jurisprudence, in part, because it broadly interpreted one of the statutory exemptions. Despite our broad interpretation of "internal personnel practices" in Fenniman, we have otherwise advanced a narrow construction of the other exemptions set forth in our Right-to-Know Law. See Montenegro, 162 N.H. at 649-50 (narrowly interpreting the "internal personnel practices" exemption to not include job titles); Prof'l Firefighters of N.H. v. Local Gov't Ctr., 159 N.H. 699, 707-10 (2010) (narrowly interpreting the exemption for "confidential, commercial, or financial information" the disclosure of which would constitute an invasion of privacy); Lambert, 157 N.H. at 379-86 (narrowly interpreting various exemptions); N.H. Civil Liberties Union v. City of Manchester, 149 N.H. 437, 439-42 (2003) (narrowly interpreting the exemption for records "whose disclosure would constitute invasion of privacy"); Goode v. N.H. Legislative Budget Assistant, 148 N.H. 551, 554-58 (2002) (narrowly interpreting the exemption for "[r]ecords pertaining to . . . confidential . . . information").

That our Right-to-Know Law jurisprudence since <u>Fenniman</u> has narrowly construed other exemptions within RSA chapter 91-A supports our conclusion that a broad interpretation of the "internal personnel practices" exemption is, at the very least, an abandoned principle.[2]  <u>See</u> <u>State v. Matthews</u>, 157 N.H. 415, 420 (2008) (concluding that a rule was "a remnant of an abandoned doctrine," in part, because it was "inconsistent with . . . our current jurisprudence").  Although in <u>Reid</u> we limited the application of <u>Fenniman</u> to its own factual context, overruling <u>Fenniman</u>'s interpretation of the exemption would further allow us to "return to our customary standards for construing the Right-to-Know Law."  <u>Reid</u>, 169 N.H. at 522.

Fourth, we ask whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification.  <u>Ford</u>, 163 N.H. at 290.  "'[We] are sometimes able to perceive significant facts or understand principles of law that eluded [our] predecessor and justify departures from existing decisions.'"  <u>Duran</u>, 158 N.H. at 154, (quoting <u>Casey</u>, 505 U.S. at 866).  We see the interpretation of the "internal personnel practices" exemption differently now than we did when <u>Fenniman</u> was decided.  As noted above, in <u>Fenniman</u>, we failed to consider a number of factors that we typically analyze when interpreting the Right-to-Know Law.  In particular, the <u>Fenniman</u> Court failed to consider: (1) the principles compelling transparent governance integrated into our constitution and the Right-to-Know Law's purpose; (2) the meaning of the exemption's words when read together; (3) the federal courts' interpretation of a similar exemption in FOIA; and (4) whether a broad interpretation of the exemption renders another exemption redundant.

As a threshold matter, the <u>Fenniman</u> Court failed to consider the import of our constitution and the Right-to-Know Law's purpose, both of which compel us to interpret the statute "with a view to providing the utmost information" and "facilitating access to all public documents."  <u>Prof'l Firefighters of N.H.</u>, 159 N.H. at 703 (quotation omitted); <u>see</u> <u>Orford Teachers Assoc. v. Watson</u>, 121 N.H. 118, 119-20 (1981).  Thus, our broad interpretation of the exemption in <u>Fenniman</u>, which has resulted in a broad category of governmental documents being withheld from public inspection, is contradictory to our state's principles of open government.  <u>See</u> <u>Reid</u>, 169 N.H. at 532 (recognizing the public's significant interest in knowing that a government investigation is comprehensive and accurate); <u>Prof'l Firefighters of N.H.</u>, 159 N.H. at 709 ("[K]nowing how a public body is spending taxpayer money in conducting public business is essential to the transparency of government, the very purpose underlying the Right-to-Know Law."); <u>N.H. Civil Liberties Union</u>, 149 N.H. at 441 ("Official information that sheds light on an agency's performance

---

[2] Although we recently applied <u>Fenniman</u>'s interpretation of the "internal personnel practices" exemption in <u>Clay</u>, 169 N.H. at 686, we were not asked at that time to reconsider <u>Fenniman</u>'s interpretation.

of its statutory duties falls squarely within the statutory purpose of the Right-to-Know Law.").

Furthermore, in Fenniman we simply noted that the meanings of the individual words in the "internal personnel practices" exemption were "quite broad," Fenniman, 136 N.H. at 626, but did not consider how, when read together, the words modify one another, thereby limiting the scope of the exemption, cf. Reid, 169 N.H. at 522. Thus, we failed to consider the meaning of the phrase "internal personnel practices" taken as a whole. See Fenniman, 136 N.H. at 626 (noting that "the dictionary does not explicitly include documents such as internal police investigatory files within the[ ] definitions" of the individual words).

The Fenniman Court also did not consider the federal courts' interpretation of a similar exemption in FOIA. RSA chapter 91-A was enacted just one year after FOIA, and the language of the "internal personnel practices" exemption closely tracks the language of a similar FOIA exemption. Compare RSA 91-A:5, IV (exempting from disclosure records pertaining to "internal personnel practices"), with 5 U.S.C. § 552(b)(2) (2018) (exempting from disclosure matters "related solely to the internal personnel rules and practices of an agency"). Accordingly, we have often looked specifically to federal case law for assistance when interpreting the "internal personnel practices" exemption, although we did not do so in Fenniman. See, e.g., Montenegro, 162 N.H. at 650; Mans v. Lebanon School Bd., 112 N.H. 160, 162-63 (1972). As a result, our construction of the exemption in Fenniman was "markedly broader than the United States Supreme Court's interpretation of that exemption's federal counterpart." Reid, 169 N.H. at 521.

Finally, in Fenniman we failed to consider whether broadly construing the "internal personnel practices" exemption, such that the exemption applies to internal investigations of an employee's misconduct, renders the exemption for "personnel . . . files" superfluous. See RSA 91-A:5, IV. The legislature is presumed not to use superfluous language and, therefore, a broad interpretation that renders statutory language irrelevant ignores legislative prerogatives. See Duran, 158 N.H. at 155.

Today, as discussed below, we consider these factors and how they circumscribe our interpretation of the "internal personnel practices" exemption. "'[W]e owe somewhat less deference to a decision that was rendered without benefit of a full airing of all the relevant considerations.'" Duran, 158 N.H. at 155 (quoting Monell v. New York City Dept. of Social Services, 436 U.S. 658, 709 n.6 (1978) (Powell, J., concurring)). Departure from precedent was justified in Duran because the precedent failed to give full consideration to the plain language of the statute and rendered other statutory language superfluous. See id. at 154. Similar concerns are present here.

The Union argues that we should not disturb our construction of the "internal personnel practices" exemption in <u>Fenniman</u> because the legislature has not corrected our prior rulings by amending RSA 91-A:5, IV, and has therefore tacitly endorsed <u>Fenniman</u>'s broad interpretation. However, legislative inaction does not preclude us from revisiting our interpretation of a statute in all circumstances. "Although stare decisis generally 'has more force in statutory analysis than in constitutional adjudication because, in the former situation, [the legislature] can correct our mistakes through legislation,' that is not always the case." <u>Duran</u>, 158 N.H. at 157 (quoting <u>Monell</u>, 436 U.S. at 695). "We are unwilling to mechanically apply the principles of stare decisis to allow a decision that was wrong when it was decided perpetuate as a rule of law." <u>Id</u>. (citing <u>Monell</u>, 436 U.S. at 695). "Neither will we always place on the shoulders of the legislature the burden to correct our own error." <u>Id</u>.

The Union also argues that we should be particularly cautious of overruling <u>Fenniman</u> because, during the last legislative session, the legislature re-referred a bill to committee that seeks to categorize certain internal disciplinary records of police departments as public records for purposes of the Right-to-Know Law. We will not be deterred, however, from correcting an error of our own creation because the legislature considered, but did not enact, a bill relating to the same subject matter in a recent legislative session. Moreover, we have no basis on which to conclude that any such legislation, if passed, would address the situation presented by this case.

"When asked to reexamine a prior holding, our task is 'to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case.'" <u>Quintero</u>, 162 N.H. at 539 (quoting <u>Casey</u>, 505 U.S. at 854). <u>Fenniman</u>'s broad interpretation of the "internal personnel practices" exemption substantially undermines the guarantees protected by the Right-to-Know Law and reduces its defining goals to lip service. "[S]uch an expansive construction would justify the criticism that our act, although promising, is 'weak and easily evaded.'" <u>Mans</u>, 112 N.H. at 162 (quoting Thomas I. Emerson, <u>The System of Freedom of Expression</u>, at 672 (1970)). The costs of overruling <u>Fenniman</u>'s interpretation are insubstantial and heavily outweighed by the rewards. As stated by the preamble of the Right-to-Know Law: "Openness in the conduct of public business is essential to a democratic society." RSA 91-A:1 (2013). An overly broad construction of the "internal personnel practices" exemption has proven to be an unwarranted constraint on a transparent government. For the reasons stated above, we overrule <u>Fenniman</u> to the extent that it broadly interpreted the "internal personnel practices" exemption and its progeny to the extent that they relied on that broad interpretation.

## C. The Arbitration Decision

Freed from the constraints imposed by Fenniman, we now consider the proper scope of the "internal personnel practices" exemption and whether the arbitration award at issue here is subject to that exemption. We conclude that the exemption applies narrowly to records pertaining to internal rules and practices governing an agency's operations and employee relations. Accordingly, the arbitration decision does not fall within the exemption. In light of this conclusion, we need not decide in this case whether Fenniman should also be overruled to the extent that it applied a per se rule, as opposed to a balancing test, prohibiting the disclosure of records that fall under the "internal personnel practices" exemption.

Together with Part I, Article 8 of our Constitution, the Right-to-Know Law is the crown jewel of government transparency in New Hampshire. Part I, Article 8 of the New Hampshire Constitution provides that:

> All power residing originally in, and being derived from, the people, all the magistrates and officers of government are their substitutes and agents, and at all times accountable to them. Government, therefore, should be open, accessible, accountable and responsive. To that end, the public's right of access to governmental proceedings and records shall not be unreasonably restricted.

N.H. CONST. pt. I, art. 8.

The preamble of the Right-to-Know Law contains a similar principle, stating, in part, that "[t]he purpose of this chapter is to ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people." RSA 91-A:1. The purpose of the Right-to-Know Law is to "provide the utmost information to the public about what its government is up to." Goode, 148 N.H. at 555 (quotation omitted). Accordingly, the statute furthers "our state constitutional requirement that the public's right of access to governmental proceedings and records shall not be unreasonably restricted." Clay, 169 N.H. at 685 (quotation omitted). We therefore resolve questions regarding the Right-to-Know Law with a view to providing the utmost information, broadly construing its provisions in favor of disclosure and interpreting its exemptions restrictively. Id.; see also Dept. of Air Force v. Rose, 425 U.S. 352, 361 (1976) (noting that FOIA exemptions must be narrowly construed). For these reasons, a narrow interpretation of the "internal personnel practices" exemption accords with our constitution and the Right-to-Know Law's underlying purpose.

"When interpreting a statute, we first look to the plain meaning of the words used." Reid, 169 N.H. at 522 (quotation omitted). Furthermore, we often look to federal case law for guidance when interpreting the exemption

10

provisions of our Right-to-Know Law, because our provisions closely track the language used in FOIA's exemptions.  Reid, 169 N.H. at 520.

"[T]he terms 'internal' and 'personnel' modify the word 'practices,' thereby circumscribing the provision's scope."  Id. at 522.  As we explained in Reid, relying on the Supreme Court's interpretation of FOIA's "internal personnel rules and practices" exemption, known as Exemption 2, "personnel" in this context "'refers to human resources matters.'"  Id. (quoting Milner v. Department of Navy, 562 U.S. 562, 569 (2011)).  "Internal" means "existing or situated within the limits of something."  Reid, 169 N.H. at 523 (quotation and ellipsis omitted).  Therefore, in Reid we construed "internal personnel practices" "to mean practices that exist or are situated within the limits of employment."[3] Id. (quotation and brackets omitted).  The Supreme Court has further explained that Exemption 2 relates to records that an agency "must typically keep . . . to itself for its own use."  Milner, 562 U.S. at 570-71 n.4.  "[T]he general thrust of the exemption is simply to relieve agencies of the burden of assembling and maintaining for public inspection matter in which the public could not reasonably be expected to have an interest."  Rose, 425 U.S. at 369-70.  Thus, Exemption 2 concerns an agency's "rules and practices dealing with employee relations or human resources," including "such matters as hiring and firing, work rules and discipline, compensation and benefits."  Milner, 562 U.S. at 570.  Examples of practices falling within Exemption 2 include "personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like."  Rose, 425 U.S. at 363 (quotation omitted).

Pursuant to its interpretation of Exemption 2, in Rose, the Supreme Court held that one-page case summaries of honor and ethics hearings maintained by the United States Air Force did not fall within the exemption. Id. at 369-70.  The Court reasoned, in part, that the case summaries did "not concern only routine matters" of "merely internal significance."  Id. at 370. Similarly, in Milner, 562 U.S. at 572, the Court held that data and maps which helped store explosives at a naval base were not subject to Exemption 2 because they did not concern "workplace rules" or the "treatment of employees."

Using Reid and the Supreme Court's interpretation of FOIA as our lodestars, we conclude that the "internal personnel practices" exemption was intended to apply only to records pertaining to the internal rules and practices governing an agency's operations and employee relations, not information concerning the performance of a particular employee.  See Milner, 562 U.S. at 569-70; Rose, 425 U.S. at 363; Reid, 169 N.H. at 523.  As we have explained

---

[3] In Reid, we remained bound by Fenniman's construction of "internal personnel practices" as extending to investigations into employee misconduct, and therefore our analysis in that case could not further limit the construction of "internal personnel practices."  See Reid, 169 N.H. at 523.

above, this narrow interpretation is consonant with our constitution and the purpose of the Right-to-Know Law.

Furthermore, our narrow interpretation recognizes the legislature's decision to enact a separate exemption for "personnel, medical, . . . and other files." RSA 91-A:5, IV; see Reid, 169 N.H. at 520. We interpret a statute in the context of the entire statutory scheme, N.H. Right to Life v. Dir., N.H. Charitable Trusts Unit, 169 N.H. 95, 103 (2016), and the legislature is presumed not to use superfluous language, Duran, 158 N.H. at 155.

Like the exemption for personnel files in RSA 91-A:5, IV, FOIA contains an exemption, known as Exemption 6, for "personnel and medical files and similar files." 5 U.S.C. § 552(b)(6) (2018). As the Supreme Court has explained, Exemption 6 shields from disclosure, in certain circumstances, an employee's "personnel file: showing, for example, where he was born, the names of his parents, where he has lived from time to time, his high school or other school records, results of examinations, [and] evaluations of his work performance." Rose, 425 U.S. at 377. Simply put, Exemption 6 protects employee files which are "typically maintained in the human resources office — otherwise known . . . as the 'personnel department.'" Milner, 562 U.S. at 570.

We conclude that records documenting the history or performance of a particular employee fall within the exemption for personnel files. See RSA 91-A:5, IV; Rose, 425 U.S. at 377. Such records pertain to an employee's work performance and are therefore typically maintained by the personnel department. See Milner, 562 U.S. at 570; Rose, 425 U.S. at 377. Records relating to internal policies pertaining to an agency's operations and employee relations, on the other hand, would not be maintained in an employee's personnel file. Thus, narrowly interpreting the exemption for "internal personnel practices" gives full effect to both exemptions that the legislature chose to enact. See Shapiro v. U.S. Dept. of Justice, 153 F. Supp. 3d 253, 280 (D.D.C. 2016) (commenting that "Exemption 6 . . . would have little purpose if agencies could simply invoke Exemption 2 to protect any records that are used only for 'personnel'-related purposes").

Applying this interpretation to the arbitration decision at issue here, we conclude that the decision does not fall within the "internal personnel practices" exemption. The decision does not relate to the personnel rules or practices of the City of Portsmouth. See Rose, 425 U.S. at 363 (listing use of parking facilities, regulation of lunch hours, and statements of policy regarding sick leave as examples of internal personnel practices); Shapiro, 153 F. Supp. 3d at 281 (holding that Federal Bureau of Investigation FOIA request evaluation forms did not come within Exemption 2 because, in part, they did not "relate solely to trivial or minor matters, akin to the use of parking facilities or lunch hours"); cf. Rojas v. F.A.A., 941 F.3d 392, 402 (9th Cir. 2019) (holding that "rules and practices for scoring tests relating to the selection of employees"

12

fell within Exemption 2).  Rather, the arbitration and the consequent decision are products of the application of those rules and practices and, because the decision relates to the conduct of a specific employee, it would be the type of information preserved in an employee's personnel file.  See Rose, 425 U.S. at 363; see also Vaughn v. Rosen, 523 F.2d 1136, 1139, 1143 (D.C. Cir. 1975) (concluding that reports evaluating how federal agencies' managers and supervisors carry out their personnel management responsibilities were not subject to Exemption 2 because, in part, they "deal with the compliance of federal agencies with policies").

Given that the trial court applied the "internal personnel practices" exemption as interpreted in Fenniman, it had no need to determine whether the decision was exempt from disclosure because it is a "personnel . . . file[ ]." RSA 91-A:5, IV.  Accordingly, we remand this issue to the trial court for its consideration, in the first instance, as to whether the arbitration decision arising from the grievance provision of the collective bargaining agreement is exempt from disclosure pursuant to the two-part analysis for personnel files. To that end, the trial court must determine: "(1) whether the material can be considered a 'personnel file' or part of a 'personnel file'; and (2) whether disclosure of the material would constitute an invasion of privacy."  Reid, 169 N.H. at 527.  We provided extensive guidance in Reid as to that analysis, and need not elaborate further on it here.  See id. at 527-33.

## D. Attorney's Fees

Finally, Seacoast has renewed the request it made to the trial court for attorney's fees.  To award attorney's fees for a violation of the Right-to-Know Law, "the trial court must find that the petitioner's lawsuit was necessary to make the requested information available and that the [City] knew or should have known that its conduct violated the statute."  Goode, 148 N.H. at 558 (quotation omitted).  The City argues that, although it may agree with Seacoast that the arbitration award should be disclosed, the Union had a colorable argument that releasing the award would violate RSA 91-A:5, IV.  We agree with the City.  As the City points out, the trial court found the Union's argument more than colorable.  In light of Fenniman, we can hardly conclude that the City "should have known" that refusing to disclose the arbitration award violated the Right-to-Know Law.  Therefore, Seacoast's request for attorney's fees is denied.

## IV.  Conclusion

For the foregoing reasons, we vacate the trial court's finding that the arbitration award is exempt from disclosure under the "internal personnel practices" exemption and remand to the trial court for further proceedings

13

consistent with this opinion.  We also deny Seacoast's request for attorney's fees.

Vacated and remanded.

HICKS and BASSETT, JJ., concurred; HANTZ MARCONI, J., concurred in part and dissented in part.

HANTZ MARCONI, J., concurring in part and dissenting in part.  I agree with my colleagues that the arbitration decision in this case is not a record pertaining to "internal personnel practices," and, therefore, does not fall under the "internal personnel practices" exemption to the Right-to-Know Law.  See RSA 91-A:5, IV (2013).  I also agree with my colleagues that this case should be remanded so that the trial court may consider whether, or to what extent, the arbitration decision at issue is exempt from disclosure under the exemption for personnel files.  See id.  I write separately because I believe that to reach this result, it is unnecessary to consider whether to overrule Union Leader Corp. v. Fenniman, 136 N.H. 624 (1993).  I believe that, as a matter of law, the arbitration decision at issue does not fall within the "internal personnel practices" exemption to the Right-to-Know Law as interpreted in Fenniman.  Thus, I concur in the result my colleagues reach, but write separately because I disagree with their reasoning.  To the extent that my colleagues have overruled Fenniman, I dissent for the reasons set forth in my dissent in Union Leader Corp. v. Town of Salem, 173 N.H. ___, ___ (decided May 29, 2020) (Hantz Marconi, J., dissenting) (slip op. at 11-16).

Fenniman concerned a petition by Union Leader Corporation for access to documents compiled during an internal investigation of a police lieutenant accused of making harassing phone calls.  Fenniman, 136 N.H. at 625.  The police department released information including the lieutenant's name and the results of the investigation, but withheld "memoranda and other records compiled during the investigation."  Id. at 625-26.  We held that the withheld records pertained to "internal personnel practices" because "they document procedures leading up to internal personnel discipline, a quintessential example of an internal personnel practice."  Id. at 626 (quotation omitted).  We also decided that the balancing test we had applied "to judge whether the benefits of nondisclosure outweigh the benefits of disclosure" was "inappropriate where, as here, the legislature has plainly made its own determination that certain documents are categorically exempt" from disclosure under the Right-to-Know Law.  Id. at 627.

In Fenniman, we noted that, at the same time that the legislature was "overhauling RSA chapter 91-A into its modern form," it was also "considering passage of what is now RSA 516:36, II," which provides that records pertaining to internal investigations of "any officer, employee, or agent" of a state or local law enforcement agency are inadmissible in any civil action "other than in a disciplinary action between the agency" and the officer, employee, or agent.  Id.

at 626; see RSA 516:36, II (2007). We also observed that when considering passage of what is now RSA 516:36, II, the legislature had apparently assumed "that RSA chapter 91-A exempted police internal investigatory files from public disclosure." Fenniman, 136 N.H. at 627.

We next addressed the interplay between RSA 516:36, II and the exemption for "internal personnel practices" under the Right-to-Know Law in Pivero v. Largy, 143 N.H. 187 (1998). In that case, a police officer sought a copy of an internal investigative file that related to him. Pivero, 143 N.H. at 188. To decide the case, we considered RSA 516:36, II and Fenniman, in addition to other statutes not relevant to the instant matter. Id. at 189-92. We explained that "[u]ntil an internal investigation produces information that results in the initiation of disciplinary process, public policy requires that internal investigation files remain confidential and separate from personnel files." Id. at 191 (citations omitted). We further explained that "these policy considerations include instilling confidence in the public to report, without fear of reprisal, incidents of police misconduct to internal affairs" as well as the need not to "seriously hinder an ongoing investigation or future law enforcement efforts." Id.

Fenniman focused upon exempting from disclosure records documenting "the procedures leading up to internal personnel discipline." Fenniman, 136 N.H. at 626. That remained our focus in Hounsell v. North Conway Water Precinct, 154 N.H. 1 (2006). At issue in that case was a report prepared by individuals who had been retained by counsel for the North Conway Water Precinct (Precinct) to investigate an employee's complaint of co-worker harassment. Hounsell, 154 N.H. at 2. The report summarized the investigation and made findings and recommendations. Id. We upheld the trial court's determination that the report was exempt from disclosure under the Right-to-Know Law because, similar to the documents in Fenniman, the report concerned an investigation that "could have resulted in disciplinary action." Id. at 4. Although we recognized that the report was not part of an internal police investigation, such as the report in Fenniman, we explained that its disclosure would implicate "policy concerns similar to those underlying the disclosure of an internal police investigatory file." Id. at 5 (quotation omitted). As the Precinct in Hounsell had argued, "the disclosure of records underlying, or arising from, internal personnel investigations would deter the reporting of misconduct by public employees, or participation in such investigations for fear of public embarrassment, humiliation, or even retaliation." Id.

In Clay, we expanded Fenniman to address records documenting procedures leading to an employer's hiring decision, but did not disturb Fenniman's central holding or the policy concerns underlying it. Clay v. City of Dover, 169 N.H. 681 (2017). Although we had previously criticized Fenniman, see Reid v. N.H. Attorney General, 169 N.H. 509, 519-22 (2016), in Clay we confirmed that it remained good law. Clay, 169 N.H. at 687.

15

The arbitration decision at issue in the instant matter does not meet the Fenniman definition of records pertaining to "internal personnel practices." Unlike the records in Fenniman and Hounsell, the arbitration decision was rendered after internal discipline had already been meted out. The police officer in this case was terminated from employment in 2015; the arbitration decision was not issued until 2018. Accordingly, the arbitration decision, unlike the records in Fenniman and Hounsell, does not document procedures "leading up to internal personnel discipline," Fenniman, 136 N.H. at 626, but rather constitutes the review of the discipline after it was imposed.

Moreover, disclosure of the arbitration decision in this case does not implicate the same policy concerns underlying our decision in Fenniman. See Pivero, 143 N.H. at 191; Hounsell, 154 N.H. at 5. Rather, disclosure of the arbitration decision implicates different policy considerations because it is part of an employee grievance proceeding, considerations that may be more appropriately addressed under the exemption for personnel files.

Because I believe that the arbitration decision does not fall within the "internal personnel practices" exemption, as construed in Fenniman and its progeny, I see no reason to consider, in this case, whether to overrule that line of cases. Nor do I believe, for the reasons set forth in my dissent in Union Leader Corp. v. Town of Salem, that our established stare decisis factors compel overruling Fenniman and its progeny. See Union Leader Corp., 173 N.H. at ____ (Hantz Marconi, J., dissenting) (slip op. at 11-16).

Although I would not overrule Fenniman in this case, to the extent that the Fenniman definition of "internal personnel practices" has been overruled and a new, narrower definition has been adopted, I agree with my colleagues that the arbitration decision at issue fails to meet that new definition as a matter of law. Like my colleagues, I would remand for the trial court to consider, in the first instance, whether the arbitration decision is exempt from disclosure pursuant to the two-part analysis for personnel files. See Reid, 169 N.H. at 527-33.